## CORPORATE CREATIONS®

Registered Agent • Director • Incorporation

Corporate Creations Network Inc.
11380 Prosperity Farms Road #221E, Palm Beach Gardens, FL 33410

July 29, 2014

Dollar Tree Stores, Inc.
Debbie Torrence Legal Administrative Assistant
Dollar Tree, Inc.
500 Volvo Parkway
CHESAPEAKE  VA  23320

# SERVICE OF PROCESS NOTICE

The following is a summary of the enclosed legal document(s) that we received.

**Note: Any questions regarding the substance of the matter described below, including the status or to whom or where to respond, should be directed to the person set forth in line 12 below or to the court or government agency where the matter is being heard.**

Item: 2014-609

| | |
|---|---|
| 1. | **Client Entity:** Dollar Tree Stores, Inc. |
| 2. | **Title of Action:** Ruthie Tully and John Tully vs. Dollar Tree Stores, Inc. and Mark Mason |
| 3. | **Document(s) Served:** Citation |
| | Petition for Damages |
| 4. | **Court/Agency:** Parish of Morehouse Fourth Judicial District Court |
| 5. | **State Served:** Louisiana |
| 6. | **Case Number:** 2014-296 |
| 7. | **Case Type:** Damages |
| 8. | **Method of Service:** Hand Delivered |
| 9. | **Date Received:** Monday 7/28/2014 |
| 10. | **Date to Client:** Tuesday 7/29/2014 |
| 11. | **# Days When Answer Due:** 15        **CAUTION:** Client is solely responsible for reviewing service of process **Answer Due Date:** 08/12/14        to verify accuracy of Answer Due Date. |
| 12. | **SOP Sender:** Duncan M. Jones |
| | (Name, Address and Phone Number)  1315 Cypress Street |
| | P.O. Box 1437 |
| | West Monroe, LA 71291 |
| | Ph: 318-388-3320 / Fax: 318-388-3337 |
| 13. | **Shipped to Client By:** Email Only with PDF Link |
| 14. | **Tracking Number:** |
| 15. | **Notes:** None. |

**NOTE:** This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information. At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process. To decrease the risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective. It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

11380 Prosperity Farms Road #221E, Palm Beach Gardens, FL 33410    Tel: (561) 694-8107    Fax: (561) 694-1639
www.CorporateCreations.com

**EXHIBIT**

tabbies®

# SERVE

D347666

# CITATION

RUTHIE TULLY, ET UX

VS 2014-296

DOLLAR TREE STORES INC, ET AL

4TH JUDICIAL DISTRICT COURT

PARISH OF MOREHOUSE

STATE OF LOUISIANA

**TO: DOLLAR TREE STORES INC THROUGH ITS REGISTERED AGENT, CORPORATE CREATIONS NETWORK, INC. – 1070-B WEST CAUSEWAY APPROACH, MANDEVILLE, LOUISIANA**

You must either comply with the demand contained in the **Petition** of which a certified copy accompanies this citation or make an appearance either by filing a pleading or otherwise in the Fourth Judicial District Court in and for the Parish of Morehouse, State of Louisiana, which Court is in the Morehouse Parish Courthouse, in the City of Bastrop, in said Parish and State, within **fifteen (15) days** after service thereof upon you, under penalty of default.

Witness the Honorable Judges of said Court and the Seal thereof on the JULY 22, 2014.

MOREHOUSE PARISH CLERK OF COURT

/s/ MICHELLE ANDERS
DEPUTY CLERK
FOURTH JUDICIAL DISTRICT COURT

RECEIVED
STP450-CIVIL
2014 A 25 A II: 38
EDMOND J. STRAIN JR.
MOREHOUSE PARISH SHERIFF



DUNCAN JONES
P.O. BOX 1437
WEST MONROE, LA 71291

## ADDITIONAL INFORMATION

THESE DOCUMENTS MEAN YOU HAVE BEEN SUED.

LEGAL ASSISTANCE IS ADVISABLE AND YOU SHOULD CONTACT A LAWYER IMMEDIATELY.

DEPUTY CLERKS OF COURT ARE NOT PERMITTED TO GIVE LEGAL ADVICE.



A TRUE COPY
CLERK AND RECORDER
FOURTH JUDICIAL DISTRICT COURT
BY DEPUTY CLERK
MOREHOUSE PARISH, LA

STATE OF LOUISIANA * PARISH OF MOREHOUSE

FOURTH JUDICIAL DISTRICT COURT

RUTHIE TULLY and
JOHN TULLY                                    FILED: _____

VERSUS NO. 2014-296

DOLLAR TREE STORES, INC. and
MARK MASON                          DEPUTY CLERK OF COURT

/s/ MICHELLE ANDERS
Jan. 13  3 52 PM '14

**PETITION FOR DAMAGES**

NOW INTO COURT, through undersigned counsel, comes and appears RUTHIE
TULLY and JOHN TULLY, major domiciliaries of Bastrop, Morehouse Parish, Louisiana, who
respectfully aver, as follows:

1.

That made defendants herein are:

A.   **DOLLAR TREE STORES, INC.,** a business corporation authorized to
do and doing business in the Parish of Morehouse, State of Louisiana.

B.   **MARK MASON,** on information and belief, a resident of Bastrop,
Morehouse Parish, Louisiana, working as the manager of the Dollar Tree.

2.

That the above named defendant is liable unto petitioner for general and special damages,
together with legal interest thereon from the date of judicial demand until paid, and for all costs
of these proceedings based on the following to wit:

3.

Petitioners show that defendant, DOLLAR TREE STORES, INC., is the owner of the
Dollar Tree Store #1886 located at 5997 Mer Rouge Road, Bastrop, Morehouse Parish, Louisiana
71220.

4.

That on December 19, 2013, petitioner, Mrs. Ruthie Tully, was a patron at the Dollar Tree
#1886.

5.

While shopping in the Dollar Tree #1886, Mrs. Ruthie Tully decided to use the restroom
before leaving the store.

ASSIGNED TO SECTION

6.

Upon entering the restroom, Mrs. Tully immediately slipped and fell on the wet bathroom floor.

7.

Upon information and belief, the floor had just been mopped and there were no wet floor signs present to warn petitioner at the time of her fall of this danger.

8.

As a result of the slip and fall, Ruthie Tully sustained numerous injuries.

9.

Mr. John Tully rushed to the restroom to help his injured wife, where he found her laying on the wet floor in severe pain.

10.

Petitioner, Ruthie Tully, received injuries to her head, neck, wrist and right shoulder, which required medical treatment due to the accident at defendant's facility.

11.

Petitioner has been diagnosed with a Rotator Cuff Rupture, requiring surgery, however, said surgery has not taken place, because the petitioner is not in a position to be able to afford the surgery, and the insurance carriers' refusal to pay for medical treatment.

12.

As a result of the defendant's negligence, Ruthie Tully has suffered both general and special damages due to her numerous personal injuries.

13.

That the defendant, Dollar Tree, through its employees, had actual knowledge, should have had actual knowledge, or created the dangerous condition on the premises of the store; however, no steps to rectify or warn of this dangerous condition were made.

14.

The wet floor in the restroom in the store, and failure to warn of the wet floor, gives rise to an unreasonable risk of harm; however, no preventative measures were taken to correct or warn of said condition by the defendant.

15.

On information and belief, the manager, MARK MASON, who was required to train or educate his employees of the store policy of placing wet floor signs in areas that were just mopped and could pose an unreasonable risk of harm, failed to train and or educate his employees.

16.

Based on Mark Mason's failure to train or educate his employee concerning the policies of the Dollar Tree, a dangerous condition was created which posed an unreasonable risk of harm.

17.

That, based on the above, defendant is strictly liable to petitioner for all damages sustained as a result of the afore-described accident.

18.

That, defendant, is liable for all damages alleged herein by petitioner, based upon the following non-exclusive acts of negligence, to wit:

   a.   In allowing a dangerous condition to exist on property owned and/or maintained by it;

   b.   In failing to give adequate and comprehensible warnings to petitioner of the dangerous condition;

   c.   In failing to properly inspect and maintain the area in question to discover the dangerous condition;

   d.   In failing to take preventive measures to keep the premises free from hazards;

   e.   In creating a danger for its patrons in having the wet floor; and

   f.   In failing to use due care commensurate with the circumstances existing therein.

19.

That petitioner asserts that each or all of said acts and failures of defendant was a proximate cause of the fall of Ruthie Tully and her resulting injuries.

20.

That petitioner, Ruthie Tully, has sustained numerous general and special damages as a result of the above-described accident including, but not limited to pain, suffering and mental anguish, past, present and future; disability, past, present and future; and medical expenses, past, present and future.

21.

That defendant is completely at fault for the cause of this accident and the resulting damages to petitioner.

22.

That petitioner did not have any fault in causing this accident.

23.

The damages sustained by petitioner, in whole or in part, are a direct result of the negligence committed by defendant, the Dollar Tree.

24.

Petitioner asserts that she is entitled to an award in an amount to be determined by this Honorable Court at the time of trial to be reasonable in the premises, plus legal interest and all costs of this matter.

25.

Petitioner, John Tully, asserts a claim for loss of consortium regarding the injuries sustained by his wife, Ruthie Tully, due to the negligence of defendant.

26.

That the amount in dispute for the claims presented herein by petitioners, Ruthie Tully and John Tully, are within the jurisdictional limits of this Court, and therefore, this Court has jurisdiction over the case, and this court is the proper venue.

27.

That amicable demand has been attempted, to no avail.

**WHEREFORE, PETITIONERS, RUTHIE TULLY and JOHN TULLY, PRAY** that defendant, **DOLLAR TREE STORES, INC.,** be served with a copy of this Petition for Damages, and be cited to answer same and that after all due proceedings had, there be judgment herein in favor of petitioners and against said defendant for all general and special damages sustained by them plus legal interest from the date of judicial demand and all costs of these proceedings.

**PETITIONERS FURTHER PRAY** for all other just and equitable relief to which they may be entitled in the premises.

Respectfully submitted,

DUNCAN M. JONES
1315 Cypress Street
P.O. Box 1437
West Monroe, LA 71291
Telephone: (318) 388-3320
Facsimile: (318) 388-3337

Duncan M. Jones
La. Bar No. 34935
*Attorney for Ruthie and John Tully*

PLEASE SERVE:

**DOLLAR TREE STORES, INC.**
Through its registered agent
CORPORATE CREATIONS NETWORK, INC.
1070-B West Causeway Approach
Mandeville, LA 70471

**BRIAN MASON**
At his place of employment
The Dollar Tree
5997 Mer Rouge Rd.
Bastrop, LA 71220

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                    SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____                    DEPUTY CLERK _____

## ANSWER, REQUEST FOR TRIAL BY JURY AND REQUEST FOR NOTICE

Dollar Tree, Inc. and Laterence Mason (generally known as Mark Mason) defendants herein, answers plaintiffs' petition as follows:

All allegations contained in the preamble of plaintiffs' petition are denied for lack of information.

I.     Dollar Tree, Inc. and Mark Mason deny each and every allegation of the petition except those allegations expressly admitted or otherwise qualified herein.

II.    All allegations contained in paragraphs 1-27 are denied except to admit that Dollar Tree, Inc. is a corporation authorized to do and doing business in the Parish of Morehouse, State of Louisiana. Dollar Tree Stores, Inc. is the owner of the store.

III.   Dollar Tree Stores, Inc. and Mark Mason request trial by jury.

IV.    Further answering, Dollar Tree, Inc. and Mark Mason aver the sole or alternatively a contributing proximate cause of the accident made the subject of this lawsuit, was the negligence of Ruthie Tully; for plaintiffs' failing to mitigate their damages; for the fault of a third party and in other respects, to be shown at the trial of this matter, each of which bars or reduces the amount of damages plaintiffs are entitled to receive herein.

V.     Dollar Tree Stores, Inc. and Mark Mason aver that they are entitled to a credit or set off for any payments made to the plaintiffs allegedly made as the result of the subject incident, by defendant or any individual, corporation, insurance company or any party hereto, and that it is entitled to a credit for any future payments made on its behalf or by any other entity.

VI.    Pursuant to Article 1572 of the Louisiana Code of Civil Procedure, we hereby request written notice of the date set for trial of the above numbered and entitled cause, or of the date set for trial or hearing, of any pleadings or motions herein, at least ten (10) days before any trial or hearing date.  We also request notice of the signing of any final judgment or of the

1

rendition of any interlocutory order or judgment in said cause as provided by Articles 1913 and 1914 of the Louisiana Code of Civil Procedure.

**AND NOW**, responding further, and upon information and belief, Dollar Tree Stores, Inc. and Mark Mason, assert the following **affirmative defenses** to each and every allegation contained in the plaintiffs' Petition.

## FIRST DEFENSE

The damages complained of by the plaintiffs were caused, wholly or in part, by the plaintiffs' fault, which serves as a bar to or in diminution of any recovery herein.

## SECOND DEFENSE

The damages complained of by the plaintiffs were caused, wholly or in part, by the fault of third persons and parties for whom Dollar Tree Stores, Inc. and Mark Mason cannot be held liable or responsible, which serve as a bar to or in diminution of any recovery herein.

## THIRD DEFENSE

The damages complained of by the plaintiffs are speculative and conjectural, which serves as a bar to or in diminution of any recovery herein.

## FOURTH DEFENSE

The plaintiffs have failed to take reasonable steps to mitigate their alleged damages, which serves as a bar to or diminution of any recovery herein.

## FIFTH DEFENSE

Plaintiffs' claims are barred or reduced to the extent a credit for payments voluntarily made by any other joint tortfeasor has been made for the damages allegedly sustained.

## SIXTH DEFENSE

Plaintiffs' claims are barred or reduced to the extent that the plaintiffs have failed to mitigate, minimize, avoid or otherwise abate any damages allegedly sustained.

## SEVENTH DEFENSE

Plaintiffs' claims are barred or reduced to the extent the claim has been settled and/or partially settled for the damages allegedly sustained.

## EIGHTH DEFENSE

In further answering, Dollar Tree Stores, Inc. and Mark Mason expressly aver, adopt and plead any and all affirmative defenses recognized in Article 1005 of the Louisiana Code of Civil Procedure, excluding fraud and including prescription as a defense.

## NINTH DEFENSE

To the extent that they are not inconsistent with Dollar Tree Stores, Inc. and Mark Mason's Answer and/or affirmative defenses, Dollar Tree Stores, Inc. and Mark Mason adopt by reference each and every affirmative defense or exception pled by any other party in this litigation as though copied herein *in extenso*.

**WHEREFORE**, Dollar Tree Stores, Inc. and Mark Mason, pray that this answer be deemed good and sufficient and that after due proceedings had there be judgment herein in favor of defendants, Dollar Tree Stores, Inc. and Mark Mason dismissing the claims of plaintiffs at plaintiffs' cost.   Dollar Tree Stores, Inc. and Mark Mason further pray for trial by jury.

Respectfully submitted,

UNGARINO & ECKERT L.L.C.

MATTHEW J. UNGARINO (#15061)
J. MICHAEL NASH (#27021)
BRIAN D. SMITH (#122151)
910 Pierremont Road, Suite 103
Shreveport, LA 71106
Telephone: (318) 866-9598
mnash@ungarino-eckert.com

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record, either by
XX electronic delivery,
☐ facsimile, or by
☐ United States mail, properly addressed and first class postage prepaid on the 5th day of September, 2014.

/s/ MATTHEW J. UNGARINO

3

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                                 SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____

_____
DEPUTY CLERK

## REQUEST FOR JURY TRIAL

Defendants, Dollar Tree Stores, Inc. and Laterience Mason (generally known as Mark Mason) request trial by jury and request the court to indicate the appropriate dollar figure for the bond and the date on which the bond is to be posted.

Respectfully submitted,

UNGARINO & ECKERT L.L.C.

_____
MATTHEW J. UNGARINO (#27021)
J. MICHAEL NASH (#15061)
BRIAN D. SMITH (#122151)
910 Pierremont Road, Suite 103
Shreveport, LA  71106
Telephone: (318) 866-9598
mnash@ungarino-ecker.com

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record, either by
☐ electronic delivery,
☒ facsimile, or by
☐ United States mail, properly addressed and first class postage prepaid on this 5th day of September, 2014.

_____
MATTHEW J. UNGARINO

## JURY ORDER

Let there be trial by jury upon defendant posting bond in the amount of
$ To be set by subsequent order, 30/45/60 days before trial.

Bastrop, Louisiana, this 16 day of September, 2014.

s/ Carl Sharp
JUDGE

012791\pleadings\01279\_jury order_atf_.doc

1

SEP 11  11 25 AM '14

BY _____ P _____
BK _____
DY _____
BY _____

FILED & RECORDED
CLERK & RECORDER
(MOREHOUSE PARISH, LA)

STATE OF LOUISIANA * PARISH OF MOREHOUSE * 4TH DISTRICT COURT

RUTHIE TULLY, ET AL

VS. NO. 2014-296

DOLLAR GENERAL STORES, INC.
AND MARK MASON

FILED: _____

_____
DEPUTY CLERK OF COURT

---

**CONFERENCE MINUTE ENTRY AND ORDER**

A status/pretrial conference was held in this matter on <u>April 14, 2015</u>. All counsel were present by telephone.   Pursuant to Louisiana Code of Civil Procedure Art. 1551:

IT IS ORDERED that a pre-trial conference be held in this matter for <u>June 23, 2015</u> at 9:30 a.m. in chambers.

IT IS ORDERED that any and all discovery shall be completed no later than <u>August 31, 2015.</u>

IT IS ORDERED that plaintiffs shall name, exchange and file a list of all witnesses, lay and expert, and exhibit list, and all disclosures required under La. C.C.P. Art. 1425 (B) no later than noon, <u>May 1, 2015.</u>   Defendants shall name, exchange and file a list of all witnesses, lay and expert, and exhibit list, and all disclosures required under La. C.C.P. Art. 1425 (B) no later than noon, <u>June 1, 2015.</u>  Plaintiffs shall name, exchange and file a list of any additional witnesses, identified as rebuttal witnesses to defendants' witnesses and exhibit list, and all disclosures required under La. C.C.P. Art. 1425 (B) no later than noon, <u>June 29, 2015.</u> THIS COURT WILL STRICTLY ADHERE TO THESE PROVISIONS. THE COURT WILL NOT PERMIT COUNSEL TO CALL WITNESSES WHO ARE NOT TIMELY LISTED.

IT IS ORDERED that the Clerk of Court shall notify this Court at least ten days prior to the trial date set hereinabove if the bond or cash deposit specified in the immediately preceding paragraph of this Order has not been posted by the responsible party so that the presiding Judge may exact appropriate measures.

IT IS ORDERED that each party shall file his/her FAX NUMBER with *Civil Section 1* within *ten days* of receipt of this ORDER for the purpose of receiving rulings and orders from this Court.

IT IS ORDERED that this scheduling order be deemed "standing" for all JURY trials set before *Civil Section 1*. Failure to comply may result in dismissal, delay and/or all appropriate actions by this Court. *Civil Section 1* may be contacted directly via fax at (318) 283-2861.

IT IS SO ORDERED.

THUS DONE AND SIGNED at Bastrop, Louisiana, this _14th_ day of _____, 2015.

_____
C. WENDELL MANNING, JUDGE
Civil Section 1

REC'D APR 1 6 2015

CERTIFICATE

It is hereby certified that a true and correct copy of the above and foregoing order has been mailed to:

Duncan M. Jones
1315 Cypress Street
West Monroe, LA  71291

Michael Nash
910 Pierremont Rd., Suite 103
Shreveport, LA  71106

BASTROP, LOUISIANA, this 15th day of April, 2015.

DEPUTY CLERK OF COURT

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296         SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____      _____
                                DEPUTY CLERK

## MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, come defendants, Dollar Tree Stores, Inc. and Mark Mason, who appear herein for the purpose of filing a Motion for Summary Judgment, showing that no genuine issues of material fact exist, and that Summary Judgment, dismissing all claims of plaintiffs, Ruthie Tully and John Tully, with prejudice, at plaintiffs' sole cost is appropriate.

Wherefore, defendants, Dollar Tree Stores, Inc. and Mark Mason, pray that this matter be set for hearing, and that plaintiffs, Ruthie Tully and John Tully, be ordered to show cause, if any they can, why the Motion for Summary Judgment should not be granted, dismissing all claims of plaintiffs against defendants, or in the alternative defendant Mark Mason, with prejudice, at plaintiffs' sole cost.

Respectfully submitted,

UNGARINO & ECKERT LLC

_____
MATTHEW J. UNGARINO (#15061)
MICHAEL NASH (#27021)
910 Pierremont Road, Suite 103
Shreveport, Louisiana 71106
Telephone: 318/866-9598
Fax: 318/866-9598
mnash@ungarino-eckert.com

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record, either by:
☐ electronic delivery,
☐ facsimile, or by
☐ United States mail, properly addressed and first class postage prepaid this the _____ day of _____, 2015.

_____
MICHAEL NASH

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                                          SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____                    _____
                                                                  DEPUTY CLERK

ORDER

CONSIDERING THE FOREGOING:

It is Ordered that plaintiffs, Ruthie Tully and John Tully, show cause, if any they can, on
the ____ day of _____, 201__, why the Motion for Summary Judgment of defendants,
Dollar Tree Stores, Inc. and Mark Mason, should not be granted, dismissing all claims of
plaintiffs against defendants, or in the alternative Mark Mason, with prejudice at plaintiffs' sole
cost.

Thus done and signed this _____ day of _____, 2015, in
Bastrop, Morehouse Parish, Louisiana.

_____
District Court Judge, 4th JDC

Service will be made pursuant to LSA CC 1313

2

12791_20141126_MSJ_jmr

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                    SECTION "4"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____        DEPUTY CLERK

_____

STATEMENT OF UNDISPUTED MATERIAL FACTS

Now into court, through undersigned counsel come defendants, Dollar Tree Stores, Inc.

and Mark Mason who appears herein for the purpose of providing this Statement of Undisputed

Material Facts pursuant to Louisiana Rules for District Courts 9.10.

1.

Plaintiffs, Ruthie Tully and John Tully, allege that, on December 19, 2013, Mrs. Tully

was in the ladies restroom at the Dollar Tree Store located at 5997 Mer Rouge Road, Bastrop,

LA, when she slipped and fell. She alleges personal injuries as a result of this incident.

2.

Ruthie Tully testified in deposition that when she entered the bathroom, she did not

encounter any problems. She sat on the commode and did not see any defects on the floor.

Thereafter, she stood up, with her pants still at her knees, and attempted to reach for toilet paper

when she allegedly slipped.

3.

Plaintiff admitted to having no personal knowledge as to where the water came from,

who caused it to be there, or how long it had been present. She also had no evidence that

Hanrah's or FSS were aware of the water.

4.

Plaintiff admitted that there was a wet floor sign placed at the entrance of the restroom

when she entered.

5.

Plaintiff's sister, Benita Suárez, testified that when she came into the bathroom to help

her sister. She likewise saw the wet floor sign at the entrance of the restroom. She had no

12791_20141126_MSJ_jmm

3

personal knowledge as to where the water came from, who caused it to be there, or how long it had been present. She had no evidence that Harrah's or FSS were aware of the water.

6.

William Reyes of FSS was deposed by plaintiffs. Mr. Reyes had no knowledge as to where the water came from, who caused it to be on the floor, or how long it had been there.

7.

The facts contained herein are supported by the depositions of Juanita Briseno, Benita Suarez, and William Reyes, attached as exhibits A, B, and C, respectively, to the Memorandum in Support of the Motion for Summary Judgment, and adopted by reference herein.

Wherefore, defendant, FSS, prays that this Statement of Undisputed Material Facts be deemed good and sufficient, and that Summary Judgment, dismissing all claims of plaintiffs, Juanita Briseno and Gilbert Briseno, be granted, with prejudice, at plaintiffs' sole cost.

Respectfully submitted,

UNGARINO & ECKERT LLC

MATTHEW J. UNGARINO (#15061)
MICHAEL NASH (#27021)
910 Pierremont Road, Suite 103
Shreveport, Louisiana 71106
Telephone:  318/866-9598
Fax:  318/866-9598
mnash@ungarino-eckert.com

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record, either by

☐ electronic delivery,
☒ facsimile, or by
☐ United States mail, properly addressed, and first class postage prepaid on the 25th day of _____, 2015.

/s/ MICHAEL NASH

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                    SECTION "4"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____        _____
                                          DEPUTY CLERK

MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

EXHIBITS:       A. Deposition of Ruthie Tully (excerpts)

                B. Deposition of John Tully (excerpts)

                C. Affidavit of Mark Mason

                D. Affidavit of Colleen Lang

FACTS/BACKGROUND

This lawsuit arises from an alleged slip and fall accident. Plaintiffs, Ruthie Tully and John Tully, allege that Mrs. Tully was at the Dollar Tree Store located at 5997 Mer Rouge Road, Bastrop, LA on December 19, 2013, when she slipped and fell after trying to stand up from a commode, located inside the store. Plaintiff has alleged negligence on behalf of the store, and a failure to train on behalf of store manager, Mark Mason.

Mrs. Tully testified in deposition on September 30, 2014. She testified that she was a regular customer of the store. (R. Tully p. 20, lines 24-25; p. 21, line 1). The store is two miles from her home, and she had been a customer since it opened. (R. Tully p. 21, lines 2-9). She visited the store between once to twice per week. (R. Tully p. 21, lines 10-12). She had previously used the bathroom located in the Dollar Tree Store, and never had any problems. (R. Tully p. 21, lines 20-25).

Mrs. Tully testified that the accident occurred the week before Christmas, and while she did not recall the actual date, agreed that the reported date of December 19, 2013, sounded accurate. (R. Tully p. 22, lines 1-18). She recalled the date being a Thursday. She arrived somewhere between 5:00 – 5:30. (R. Tully p. 22, lines 19-25). She and her husband were shopping for cards and "stuff for Christmas" such as bags. (R. Tully p. 23, lines 1-8). Upon entering the store, she recognized the assistant manager, a Caucasian female, an African

12791_20141126_MSJ_jmm

American female employee (a checker) and an African American male employee (a stocker). (R. Tully, p. 23, lines 9-25; p. 24, lines 1-10).

When plaintiff first entered the store, she got a buggy and then went to look for cards. (R. Tully, p. 24, lines 14-19). The cards are to the right of the store, whereas the bathroom is straight back from the entrance of the store, in the left corner. (R. Tully, p. 24, lines 22-25; p. 25, lines 1-2). Plaintiff had no problems walking in the store. She was wearing sandals. (R. Tully, p. 25, lines 3-7). She does not recall when she saw the African American male, but recalled him stocking towards the back of the store. (R. Tully, p. 26, lines 9-22). Mrs. Tully was in the store for about 30 minutes, and was getting ready to leave when she decided to go to the bathroom. (R. Tully, p. 26, lines 23-25; p. 27, lines 1-2). Plaintiff never saw the African American male employee doing anything other than stocking. (R. Tully, p. 27, lines 12-20). She had seen the female manager at the front of the store, checking customers. (R. Tully, p. 27, lines 21-25). She never saw the African American female employee until after the accident. (R. Tully, p. 28, lines 1-3). Plaintiff confirmed that, at no time prior to her accident, did she see any employees of Dollar Tree in the back area near the bathrooms. (R. Tully, p. 28, lines 4-11).

Mrs. Tully testified that the ladies bathroom is in the back, left corner of the store, inside an opening of the back of the store. (R. Tully, p. 29, lines 12-23). When she approached, she thought that the door to the bathroom was open. (R. Tully, p. 29, lines 24-25; p. 30, line 1). She did not have to knock first, and the door was not locked. She thought it was open. (R. Tully, p. 30, lines 2-7). She walked in and turned on the light. (R. Tully, p. 30, line 25; p. 31, lines 1-2). She expressed no concern about the adequacy of the lighting, and agreed that it gave her an opportunity to see whatever was on the floor. (R. Tully, p. 31, lines 10-15). The bathroom is cube-shaped, with the commode in the far left corner, and the sink in the far right corner. (R. Tully, p. 31, lines 16-21).

When plaintiff entered the bathroom, she walked directly to the commode. She made it safely to the commode, and did not encounter any slick surfaces. (R. Tully, p. 32, lines 5-12). She sat on the commode and did not see anything on the floor. The bathroom appeared clean and orderly, with no trash on the floor. (R. Tully, p. 32, lines 17-25). Plaintiff finished her business, stood up, with her pants still down, and reached for toilet paper, when she slipped. (R. Tully, p. 33, lines 1-25; p. 34, lines 12-25; p. 35, lines 1-20). After standing, she took a step to get paper. (R. Tully, p. 36, lines 5-25; p. 37, lines 1-7). After stepping, she started to slip. (R. Tully, p. 37, lines 23-25). She started slipping with her left foot, towards the left side. (R. Tully

6

rl2791_20141126_MSJ_jmn

p. 38, lines 9-15). She was leaning just a bit to her right at this time. (R. Tully p. 39, lines 1-2). Plaintiff confirmed that she was able to reach the paper while she still seated. (R. Tully p. 40, lines 10-14). She confirmed using paper before she got up, then stood to get more paper, and then fell. (R. Tully p. 40, lines 22-25; p. 41, lines 1-3). After her foot starts to slip, she falls to the floor. (R. Tully p. 41, lines 21-25; p. 42, lines 19-21). At this point, her pants are still at or just above her knees. (R. Tully p. 43, lines 5-13).

After her fall, plaintiff called out for her husband. It took him a few minutes to arrive. (R. Tully p. 43, lines 14-23). Plaintiff states that she felt something wet on the floor. (R. Tully p. 45, lines 1-4). She stated that she felt the wetness near her legs, but did not recall getting her pants wet. (R. Tully p. 45, lines 8-11). After her husband came in, he tried to help her up. He then went to get the assistant manager. (R. Tully p. 45, lines 16-25, lines 1-3). The assistant manager came to the bathroom, and expressed concern for Mrs. Tully. (R. Tully p. 46, lines 19-24). Mrs. Tully testified that the assistant manager stated that someone had mopped the bathroom. She did not say who had mopped, or when it was mopped. She did not know how long the floor had been wet, and never saw any store employees near the restroom mopping during the 30 + minutes she was in the store before her accident. (R. Tully p. 47, lines 9-16). Plaintiff confirmed that the spot was just a step over from the commode. (R. Tully p. 49, lines 3-11).

Plaintiff never saw what was on the floor. (R. Tully p. 47, lines 17-20). She believed only the one spot was wet. (R. Tully p. 52, lines 5-7). She did not know how large the spot was. (R. Tully p. 52, lines 10-11). She confirmed that neither the sink nor the toilet were leaking. (R. Tully p. 52, lines 18-21). She confirmed no personal knowledge as to how long the water had been on the floor, and agrees that she did not see anyone mop the floor while she was in the store. (R. Tully p. 54, lines 5-13).

With regard to Mark Mason, plaintiff testified that she did not know him, but understood that he was the store manager. (R. Tully p. 56, lines 2-10). Plaintiff admits to having no knowledge about any training Mr. Mason provided to his employees, or whether Mr. Mason refused to follow store training protocols. (R. Tully p. 56, lines 18-25; p. 57, lines 1-11). Mrs. Tully had no knowledge as to store practice for mopping, including when the store mopped. (R. Tully p. 59, lines 2-7).

Mr. Tully testified about the incident. He was at the store on the date in question, with his wife. (J. Tully p. 8, lines 19-24). He would go with his wife most of the times she went to

12791_20141126_MSJ_jmn

7

the store. (J. Tully p. 9, lines 2-4). She could drive on her own, but he typically would drive her to the store. (J. Tully p. 9, lines 5-11). He recalled that his wife was looking for cards and Christmas bags that day. (J. Tully p. 9, lines 12-19). They had gotten to the store around 5:00pm, and were in the store for 35 – 40 minutes. (J. Tully p. 9, lines 25, p. 10, lines 1-4). When he first entered the store, he saw the Caucasian female up front, checking customers. She greeted them when they arrived. (J. Tully p. 10, lines 5-11). He also recalled seeing an African American male doing stocking, but did not see any other employees. (J. Tully p. 10, lines 12-15). The male was doing stocking the entire time they were in the store. (J. Tully p. 10, lines 19-24). He never saw the female do anything other than work up front. (J. Tully p. 10, line 25; p. 11, lines 1-2).

Mr. Tully testified that his wife decided to stop by the restroom located in the left rear corner of the store, in a back area. (J. Tully p. 11, lines 3-9). The restrooms were on the left wall at the back of the store, in the back open area. (J. Tully p. 11, lines 16-20). When his wife went into the ladies' room, he went over to the automotive department. (J. Tully p. 12, lines 18-21). He heard his wife holler, and went back to the restroom area. The door to the ladies' room was locked, so he pulled out his knife to force the door open. (J. Tully p. 12, lines 22-25). During the time they were in the store, before the accident, he never saw any employees near the bathroom, mopping. He agreed that the two employees he saw were either checking customers or stocking. (J. Tully p. 13, lines 2-9). He agreed that, if the female employee had gone to mop the bathroom while he was there, he would have seen her do it. (J. Tully p. 13, lines 14-17).

Once Mr. Tully gains access to the bathroom, he saw his wife on the floor, and she could not get up. (J. Tully p. 14, lines 2-6). Her feet were pointed towards the toilet, and her head was to the right. (J. Tully p. 14, lines 7-13). He claimed that the floor was wet by his wife's ankles, with an area of 3 feet. (J. Tully p. 14, lines 21-25, p. 15, lines 1-3). After helping his wife with her pants and trying to dry the floor, Mr. Tully went to find the manager. (J. Tully p. 15, lines 10-14). The manager came to the restroom and told him they had mopped. (J. Tully p. 16, lines 4-6). She did not say when the floor had been mopped. (J. Tully p. 16, lines 7-9). He agreed that, if any mopping had been done, it would have been before he had entered the store. (J. Tully p. 16, lines 15-22). He had no personal knowledge as to where the liquid had come from. (J. Tully p. 16, lines 23-25, p. 17, line 1). He had no knowledge as to when the substance got on the floor. (J. Tully p. 17, lines 2-4). He agreed that he had no knowledge if the liquid had come from mopping or from anything else. (J. Tully p. 17, lines 5-7). None of the employees had

8

12791_20141126_MSJ_jmn

admitted that they had mopped the floor before the accident. (J. Tully p. 18, lines 23-25; p. 19, lines 1-11).

Mr. Tully had no knowledge regarding store policy or training for mopping, including schedules. (J. Tully p. 17, lines 8-16). Mr. Tully was aware of who Mr. Mason, the store manager, is. (J. Tully p. 17, lines 17-21). He has no knowledge as to anything Mr. Mason did to cause water to be on the floor, or any mistakes or failures he had in training his employees. He could not say that Mr. Mason failed to follow protocol in training his employees. (J. Tully p. 18, lines 3-14).

Mr. Mason testified via affidavit. He stated that he was the store manager at the time of the alleged accident, but was not present in the store. He has been with Dollar Tree for about 12 years before the accident. He trains all of his employees pursuant to publications and video presentations which Dollar Tree provides him. Each employee is trained on safety upon being hired, and attends monthly safety meetings on topics selected by Dollar Tree at the corporate level. Mr. Mason further testified that the store is mopped outside of store hours, unless there is a spill. If a spill is found, the area is mopped and towel dried, with wet floor signs placed until the area is dry. He was present at the store up until about 30 minutes before the accident, and did not recall any of his employees mopping the ladies room for the several hours before the accident.

Colleen Laing also testified via affidavit. She was the assistant manager, and was on duty at the time of the incident. She had been at the store for about 4-5 years before the accident. While on duty, she is the employee responsible for maintaining the ladies restroom. She is very particular about the restroom, as it is the only restroom available to her while she is at work. Mopping is typically performed after store hours, but they do spot cleaning for spills. When she spot cleans, she will mop and then use paper towels to dry the floor and place a wet floor sign until the floor is dry. She did not mop the bathroom that day, and is not aware of any other employee mopping before the accident. She had no knowledge of any substance on the floor before the accident.

With regard to training, Ms. Laing stated that, upon her hiring, she was given training which included safety. She also attended monthly training classes from materials provided by Dollar Tree at the corporate level. That training included prevention of falls and other accidents.

# LAW AND ARGUMENT

## A. Summary Judgment Standard

A Motion for Summary Judgment shall be granted "if the pleadings, depositions, Answers to Interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. Article 966(B). As this court is well aware, the Summary Judgment procedure is favored and should be construed to accomplish the just, speedy, and inexpensive determination of every action. La. C.C.P. Article 966(A)(2).

Amendments to La. C.C.P. Article 966 places the burden of producing evidence at the hearing for the Motion for Summary Judgment on the mover, who could ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element of the opponent's case. At that point, the party who bears the burden of persuasion at trial must come forth with evidence which demonstrates he or she will be able to meet the burden at trial. Marist Lennon, *La Civil Law Treatistes: Civil Procedure*, Section 6A. (1999).

Once the Motion for Summary Judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. *Racine vs. Moon's Towing*, 2001-2837 (La. 05/14/02), 817 So. 2d 21; *Hardy vs. Bowie*, 98-2821 (La. 09/08/99), 744 So. 2d 606; *Hayes vs. Autin*, 96-7287 (La. App. 3rd Cir. 12/26/96), 685 So. 2d 691, writ denied, 97-0281 (La. 03/14/97), 697 So. 2d 41.

## B. Liability

Given the allegations of plaintiff, a claim could be made under either the Merchant Liability Statute, pursuant to LSA RS 9:2800.6, or pursuant to LSA CC 2317 and 2317.1. Both methods of liability are discussed herein, and essentially require the same burden and evidence.

LSA RS 9:2800.6 states:

"A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone to prove failure to exercise reasonable care.

C. Definitions:

(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. For purposes of this Section, a merchant includes an innkeeper with respect to those areas or aspects of the premises which are similar to those of a merchant, including but not limited to shops, restaurants, and lobby areas of or within the hotel, motel, or inn.

D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322, or 2695."

LSA-RS 9:2800.6 is applicable to this situation, as Dollar Tree clearly qualifies as a merchant.

Pursuant to the statute, plaintiff must prove the existence of a hazard on the merchant's property, and must also show that the condition was an unreasonable risk of harm, either created by or known of by the merchant, or had actual or constructive notice of the condition, and that the merchant failed to exercise reasonable care. Plaintiff's failure to prove any element is fatal to her case. *Harrison v. Horseshoe Entertainment*, 294 (La. App. 2d Cir.08/14/02), 823 So. 2d 1124, citing *White v. Wal-mart Stores Inc.*, 97-0393 (La. 09/09/97), 699 So. 2d 1081.

Under LSA-RS 9:2800.6, the court in *Jones v. Brookshire Grocery Co.*, 37, 119 (La. App. 2d Cir.05/14/03), 847 So. 2d 43, noted that the Merchant Liability Statute "places a heavy burden of proof on plaintiffs in claims on merchants for damages arising out of a fall on the premises." The court further noted that, while required to exercise reasonable care, a merchant is not the insurer of the safety of his patrons. The court discussed the claims of liability against a grocery store, when the plaintiff alleged that she tripped and fell due to a wrinkle in a floor mat. The court noted that no employees saw the wrinkle in the floor mat before or after the fall, and that the plaintiff admitted that she did not see the wrinkle before she fell. The court of appeal affirmed the trial court's determination that the plaintiff failed to show the existence of a hazard at the time of the alleged incident. The court in *Wallball v. E-Z Serve Convenient Stores, Inc.*,

988 F.Supp. 966 (ed. la 1997), noted that a claimant must show the existence of a condition prior to the fall. This court further noted that the defendant was not required to show the absence of a condition. This places the burden of proof on plaintiff. The court in this case noted that plaintiff could not show the existence of any hazard. A store employee advised that, when the plaintiff entered the store, the employee was looking at the area around the entrance, and found no water on the floor. Plaintiff failed to offer any witnesses who would support her contentions.

Accordingly, the court ruled in favor of the store, finding no hazard.

Section (B)(2) of 9:2800.6 requires that either the merchant created or was aware of the hazard. In order for plaintiff to meet her burden, with regard to knowledge on behalf of the merchant, plaintiff must show that employees actually knew of the hazard or show the "condition" remained on the floor for such a period of time that the defendant would have discovered it by the exercise of ordinary care. LSA R.S. 9:2800.6 does not allow for the inference of constructive notice "absent of this temporal element" See *Allen*, id. Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question; however, there remains the prerequisite showing of some time period. "A claimant who simply shows that the condition existed without an additional showing that the condition existed for some time before the fall has not carried the burden of proving constructive notice as mandated by the statute." See *Allen*, id. "To avoid a Summary Judgment Motion, mere speculation or suggestion is not enough to meet the stringent burden imposed upon the plaintiff by LSA R.S. 9:2800.6." See *Allen*, id.

In *Allen*, id, the court found the plaintiff's lack of evidence regarding the length of time the substance in question was on the floor was fatal to her case. As plaintiff was unable to provide any evidence regarding when the substance first came to be on the floor, or the length of time that it was on the floor, she was unable to meet her burden of proof.

Likewise, the court in *White v. Walmart Stores, Inc.*, 97-0393 (La. 09/09/97), 699 So. 2d 1081, noted the requirement of showing actual or constructive notice. The court also noted that the burden was also on the plaintiff to show notice. The court further stated, "There is no provision in LSA R.S. 9:2800.6 that allows shifting the burden to the defendant to disprove his culpability."

Here, plaintiff and her husband both admit to having no personal knowledge as to what caused the alleged substance to be on the floor. While they both said that the assistant manager told them that the floor had been mopped, they did not know when this happened, or even if

mopping caused the substance. They both admit to having no knowledge as to how long the substance had been present, or that Dollar Tree employees knew if it. The statement that they attribute to the assistant manager does not show actual or constructive knowledge, as it does not show when the alleged mopping was done, or that water was left on the floor afterwards.

Mr. Mason testified that he was at the store, but left about 30 minutes before the accident. He was not aware of any employee mopping the bathroom before the accident occurred. The floor is typically mopped outside of store hours, except for spot mopping of spills. When spills are mopped, the floor is dried with paper towels afterwards.

Ms. Laing also testified about this matter. She was the assistant manager on duty, and came to the restroom to check on Mrs. Tully. She stated that she was the employee responsible for maintaining this restroom, and that she had not mopped it that day. She further stated that mopping is done after store hours, unless a spill is found. If a spill is mopped, she uses paper towels afterwards to dry the floor and places a wet floor sign.

The allegations of plaintiff might also be made pursuant to LSA-CC Art 2317.1, which states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case

In determining liability for the alleged vices of a property, the plaintiff must prove that, "1) the thing has a vice or defect; 2) the defect presented an unreasonable risk of harm to others; 3) the thing was in defendant's custody; and 4) damage was caused by the defect; failure to prove any one element is fatal to a statutory claim." See *Hamilton v. Kansas City Southern Railway Company*, 1997-1650 (La. App. 3 Cir. 4/1/98), 710 So.2d 358.

It is recognized that the party having garde does not have a duty to eliminate all variations existing along the countless cracks, seams, joints and curbs. See *Reed v. Wal-Mart Stores, Inc.*, 1997-1174 (La. 03/04/98), 708 So.2d 362. Furthermore, the fact that "a pedestrian fell does not elevate the condition to that of an unreasonably dangerous defect. See *Boddie v. State of Louisiana*, 27,313 (La. App. 2d Cir. 09/27/95), 661 So.2d 617. Finally, "where a risk of harm is obvious, universally know and easily avoidable, the risk is not unreasonable." See *Thornton v. Board of Supervisors of Louisiana State University, et al*, 29,898 (La. App. 2d Cir. 10/29/97), 702 So.2d 72.

The *Hamilton*, supra, court noted, "in both negligence and strict liability cases, the court or jury must balance the probability and magnitude of the risk against the utility of the thing in determining whether there is an unreasonable risk of harm." The court noted that a custodian would not be held responsible for every injury resulting from every risk, but "only those injuries caused by unreasonable risks of harm to others." The court in *Littlefield v. Iberia Bank*, 04-1334 (La. App. 5 Cir. 3/15/05), 900 So.2d 925, found defendant not liable when plaintiff tripped on a recently renovated and undesignated incline. The court noted that plaintiff must prove; "1) that the defendant knew or should have known of the vice or defect, 2) that the damage could have been prevented by the exercise of reasonable care, and 3) that the defendant failed to exercise reasonable care.

The Court in *Ryle v. Baton Rouge General Hospital*, 376 So.2d 1024 (La. App. 1 Cir. 1979), discussed a parking lot trip and fall involving a bumper guard. The court noted, "The mere fact that an accident happened does not create a presumption of the defendant's negligence. The duty owed by the hospital to patients' visitors is that of exercising reasonable care for their safety."

Thus, in showing liability pursuant to LSA-CC-2317 and 2317.1, plaintiff must show the existence of a defect, that defendant either knew or should have known of the defect, that the defect caused the accident, and that plaintiff suffered an injury as a result of the defect. Failure to show any element is fatal to the allegations. Here, no party can show that Dollar Tree either knew of/should have known of the alleged defect. Both Mr. and Mrs. Tully admit that they had no knowledge how long the substance was on the floor, or that it came from employees of Dollar Tree. In fact, while they stated that the assistant manager told them the floor had been mopped, they admit to not knowing when the floor was mopped or what the mopping procedure was. They also testified that the floor and not been mopped during the 30 – 40 minutes they were in the store. Mr. Mason and Ms. Laing both testified that the store is mopped after hours, except for spot mopping, and then the floor is dried with paper towels. Accordingly, even if the floor had been mopped some 30 – 40 minutes before the incident, based on store procedure, there is no evidence that the floor was left wet. Thus, there is no evidence, pursuant to 2317 and 2317.1, that Dollar Tree was negligent.

Finally, plaintiffs alleged a failure to train by Mr. Mason, which caused or contributed to this incident. Both admit in their depositions that they have no evidence to support this contention. Mr. Mason and Ms. Laing both testified about training provided to the employees.

Mr. Mason stated that new employees are provided training, and all employees are given monthly training. Ms. Laing agreed with his statements. The evidence shows that Mr. Mason followed the training protocol dictated by Dollar Tree at the corporate level. There is simply no evidence, whatsoever, that Mr. Mason did or failed to do anything which contributed to this loss.

Accordingly, summary judgment is appropriate, dismissing him as a named defendant.

## CONCLUSION

There is no evidence that employees of Dollar Tree either knew or should have known of any water on the floor at the time of the accident. Plaintiff and her husband both admit to having no knowledge as to when the alleged substance came to be on the floor, how long it was there or who caused it. Their statement about prior mopping by the store does not prove when the floor would have been mopped, or that it was left wet. Mr. Mason and Ms. Laing both state that the floor had not been mopped for the several hours before the accident, and would have been dried had it been mopped. Plaintiffs fail to meet their burden of knowledge on behalf of Dollar Tree.

Accordingly, Summary Judgment, dismissing all claims of plaintiff is appropriate.

Plaintiffs also fail to show that Mr. Mason did or failed to do anything which caused or contributed to this accident. They both admit to having no knowledge about what training he provided. Mr. Mason and Ms. Laing both testified that employees were provided training through initial and monthly training, including slip-and fall prevention. As plaintiffs have no evidence to the contrary, it is appropriate to dismiss all claims against Mr. Mason.

Respectfully submitted,

UNGARINO & ECKERT LLC

/s/ MATTHEW J. UNGARINO (#15061)
/s/ MICHAEL NASH (#27021)
910 Pierremont Road, Suite 103
Shreveport, Louisiana 71106
Telephone:   318/866-9598
Fax:   318/866-9598
mnash@ungarino-eckert.com

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record by:
☐ electronic delivery.
☒ facsimile, or by
☐ United States mail, properly addressed and first class postage prepaid on this ___ day of ____, 2015.

/s/ MICHAEL NASH

12791_20141126_MSJ_jmn

15

ORIGINAL

STATE OF LOUISIANA * PARISH OF MOREHOUSE

FOURTH JUDICIAL DISTRICT COURT

RUTHIE TULLY AND
JOHN TULLY                    * * * * * * * * * * * * * *

VERSUS                        NO. 2014-296
                              SECTION "1"

DOLLAR TREE STORES, INC.
AND MARK MASON                * * * * * * * * * * * * * *

                    * * * * * * * * * * * * * *

                    DEPOSITION OF

                    RUTHIE ANN TULLY

                    September 30, 2014

                    * * * * * * * * * * * * * *

Taken At the Law Offices Of:

            Duncan M. Jones
            1315 Cypress Street
            West Monroe, Louisiana 71291

                    * * * * * * * * * * * * * *

Reported By:

            MARGERET ANN COPELAND
            CERTIFIED COURT REPORTER
            CERTIFICATE NO. 92160
            PARISH OF OUACHITA
            STATE OF LOUISIANA

Duke Copeland Court Reporters
P.O. Box 4177, Monroe, LA 71211  Tel. 318-387-2889 Fax 318-387-2371

EXHIBIT
A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    A    Oh, my.  Forty--forty-six years ago.

2    Q    Okay.

3    A    I'm a homemaker.

4    Q    Okay.  Now, that is employment, --

5    A    And I--

6    Q    --but of a different--

7    A    Yes, sir.

8    Q    --nature.  I--

9    A    Yes, sir.

10    Q    My wife has got the same job.

11    A    Oh, okay.  That's--

12    Q    I'm sure your employer's sweeter than hers, but--

13   So I'm guessing that no claim for lost wages as a result of
     the accident at Dollar Tree?

14    A    No, sir.

15    Q    Okay.  That'll save us a little time.

16    A    Okay.

17    Q    Okay.  We're going to talk about the accident.

18    A    Okay.

19    Q    Now, I've been to the store, so I generally know
     what it looks like and, of course, a lot of these stores
     pretty much look the same, --

20    A    Okay.

21    Q    --but let's get a little background first.  Were
     you a regular customer at this store?

1    A    Yes, sir.

2    Q    About how far is the store from your house?

3    A    Oh. I want to say about two miles.

4    Q    How long had the store been open, that you recall?

5    A    I don't recall.

6    Q    Okay.

7    A    Just a long time, but I don't—

8    Q    Okay. And how long had you been a customer there?

9    A    Ever since they opened.

10   Q    All right. And about how frequently would you go
          to the store?

11

12   A    At least once a week, and maybe twice a week.

13   Q    What kind of products would you shop for at Dollar
          Tree?

14

15   A    Mostly cards, and then household things, kitchen
          stuff.

16

17   Q    Okay. Like cleaning products and that—

18   A    Yes, sir.

19   Q    —kind of stuff? Uh-huh (yes). I understand that.

20   All right. Had you ever used the bathroom at this Dollar
     Tree before?

21

22   A    Yes, sir.

23   Q    Okay. Had you ever had any problems with the
          bathroom before this day?

24

25   A    No, sir.

```
 1   Q     Okay.    Do you recall the specific date of this
 2   accident?
 3   A     It was a week before Christmas.
 4   Q     Okay.    All right.
 5   A     And I've got it wrote on other things,--
 6   Q     That's fine.
 7   A     --but I don't recall the date.
 8   Q     We're going to cheat.
 9   A     Okay.
10   Q     I have the paperwork that your attorney filed with
11   the court,--
12   A     Okay.
13   Q     --and I'm going to read the date off of there,--
14   A     All right.
15   Q     --and it says, "December 19 of 2013."
16   A     Okay.
17   Q     Does that sound right to you?
18   A     Yes, sir.
19   Q     Very good.    Do you recall what day of the week that
20   would have been?
21   A     I think a Thursday.
22   Q     And about what time were you at the store?    What
23   time did you arrive?
24   A     I'm going to guess, maybe, about--I'm not sure, but
25   around 5:00 or 5:30.
```

1    Q    Okay.  Who was with you at the store, if anyone?

2    A    My husband.

3    Q    All right.  And what were you shopping for on this

4    day?

5    A    Cards and different stuff for Christmas.  Bags,

6    stuff like--

7    Q    Like gift bags?

8    A    Yes, sir.

9    Q    Okay.  Did you recognize any of the employees on

10   duty?

11   A    Yes.

12   Q    Who did you recognize?

13   A    I don't know her name, but I think she's one of

14   them--the managers.

15   Q    Okay.  Describe her for me.

16   A    She's got--well, she did have kind of mid-length

17   hair, little, and I would always--we would see her most of

18   the time we--

19   Q    All right.

20   A    --were in there.

21   Q    Okay.  She's Caucasian or African--American or

22   other?

23   A    Caucasian.

24   Q    Okay.  And her hair color, if you can recall?

25   A    I don't recall on--I see her all the time, but I

```
 1   don't really recall, because I think it changes.
 2        Q    I understand.  Okay.  And you believe she was one
 3   of the managers?
 4        A    Yes, sir.
 5        Q    Okay.  Any other employees that you recall seeing
 6   that day?
 7        A    It was two blacks, but I--I don't know--one I--one
 8   remember, she's checked me--checked me out before, maybe in
 9   the daytime, and then the--it was another black guy and he--I
10   think he stocks and all.
11        Q    Okay.
12        A    I hadn't seen him before, though.  He was--we've
13   had to asked him that day on where something was.
14        Q    Okay.  Well, let's do it this way then:  You come
15   into the store.  What's the first thing you go do?
16        A    Go look for the cards and the bags and every what
17   else I got that night.  I can't remember what.
18        Q    Okay.  Did we use a buggy?
19        A    Yes; yes.
20        Q    Okay.
21        A    Uh-huh (yes).
22        Q    All right.  Where are the cards and the bags in
23   relation to the bathroom?
24        A    The cards are when you come in to the right and the
25   bathroom is straight back.
```

```
 1    Q    Kind of in the left corner?

 2    A    Yes, sir.

 3    Q    All right.  Did you have any difficulty with

 4  anything else in the store before reaching the bathroom?

 5    A    No, sir.

 6    Q    Okay.  What kind of shoes were you wearing?

 7    A    I was wearing sandals.

 8    Q    As part of the discovery responses I received from

 9  your attorney, he gave me two pictures and I'm just going to

10  get you to identify these, if you could tell me.  The first

11  picture we'll call "Exhibit 2" and the second we'll call

12  "Exhibit 3."

13    A    Okay.

14    Q    Do these look like the shoes you were wearing that

15  day?

16    A    Yes, sir.

17    Q    You believe these are the shoes you were wearing

18  that day?

19    A    Yes, sir.

20    Q    And just a brief description of those:  Those are

21  like slide-on sandals?

22    A    Yes, sir.  And they're the rubber soles and they're

23  cushioned.

24    Q    How long had you had those shoes before the

25  accident?
```

1    A    Year.

2    Q    Okay.  Had you ever had any problems with them?

3    A    No, sir.

4    Q    Had you ever fallen while wearing them?

5    A    No, sir.

6    Q    Okay.  So we go find the cards and the bags.

7    Correct?

8    A    Yes, sir.

9    Q    Okay.  At what point did you encounter the

10   African-American male?  You'd mentioned that you needed to

11   ask where something was.  How long had you been in the store

12   before that happened?

13   A    I--I don't recall on that.

14   Q    Okay.

15   A    We--we just saw him in the--I think he was in the

16   back, stocking stuff at the back of the store.  I'm not even

17   su---I'm not sure on that.  I just--

18   Q    Okay.  And is that like along the back wall or was

19   he in the back stocking room?

20   A    I think he was on one of the aisles, at the back,

21   but I'm not--you know, I'm not sure.  I just remember seeing

22   him afterward, too.

23   Q    Okay.  About how long had you been in the store

24   before you went toward the bathroom?

25   A    Oh.  We was getting ready to go home, so I'm--I'm

1  going to say about--I'm not sure on the time, but I'm going

2  to say about thirty minutes, thirty-five minutes, maybe.

3      Q    Okay.  Other than cards and bags, what else had you

4  acquired?

5      A    That's all I can remember.  That's--

6      Q    I understand.  You wouldn't happen to still have

7  the receipt from that trip, would you?

8      A    Oh, no, sir.

9      Q    All right.  Okay.  Did we pay with cash or credit

10 card that day?

11     A    Cash.

12     Q    Okay.  The one time that you saw--or anytime that

13 you saw the African-American male, was he always stocking?

14     A    I--I don't recall on that, and I'm--when I'm

15 saying, "Stock" or, "Stocking," I meant like-

16     Q    Checking the shelves or--

17     A    Yeah.  On the shelves or something.  I don't know.

18     Q    Did you ever see him do something other than

19 stocking?

20     A    No.

21     Q    Okay.  Now, what about the female manager?  Did you

22 see her in the store before your accident?

23     A    Yes, sir.

24     Q    Where did you see her?

25     A    Checking.

1   Q   Okay.  And the African-American female that you

2   described as a checker, what was she doing?

3       A   I didn't see her until after the accident.

4       Q   All right.  At anytime prior to your accident, did

5   you see any of the store employees in that back area where

6   the bathrooms are?

7       A   No, sir.

8       Q   Okay.  So for the thirty, thirty-five minutes you

9   were there, you never saw them in that back corner doing

10  anything with the bathrooms?

11      A   No, sir.

12      Q   Okay.  All right.  Who's pushing the buggy, you or

13  your husband?

14      A   Me.

15      Q   Okay.  All right.  You're getting ready to leave

16  and you made a decision to stop by the restroom.  Correct?

17      A   Yes, sir.

18      Q   Okay.  Aside from the shoes, which we've seen

19  pictures of, what other attire were you wearing?  How were

20  you dressed that day?

21      A   I don't remember, but more than likely, if I had

22  sandals on, I had capris on.

23      Q   Okay.  Now, I know this is December, but I don't

24  remember how cold it was.

25      A   I don't either, but for san- -- I don't know.  On

1   capris-- But if it's more--even in December--if--if I had

2   the sandals on, it was probably warm, but--

3   Q   Okay.  Do we wear socks with the sandals?

4   A   No, sir.

5   Q   Okay.  Or stockings or any other foot cover, other

6   than the shoes?

7   A   No, sir.

8   Q   Okay; okay.  So you tell your husband, "Watch the

9   buggy.  I've got to go back here and I'll be back in a

10  minute"?

11  A   Yes, sir.

12  Q   Okay.  All right.  Now, you've been to this

13  bathroom before?

14  A   Yes, sir.

15  Q   Okay.  And as I understand it, as you walk into

16  that back left corner of the building, there's a little open

17  area with bathrooms on the left wall?

18  A   Yes, sir.

19  Q   Okay.  Women's first, and then men's second?

20  A   I'm not sure on the men's, but I know the women's

21  is on the left.

22  Q   Women's is right there on the left?

23  A   Yes, sir.

24  Q   Okay.  When you approached, was the door open?

25  A   You know, I don't reca- --I think it was open a

little, but I don't--I don't recall.

1    Q   Okay. Did you have to knock before you entered?

2    A   No, sir.

3    Q   Okay. Was the door locked?

4    A   No, sir.

5    Q   Okay. So you think it was open a little bit?

6    A   Yes, sir.

7    Q   And was that your experience in the past that, when

8 the bathroom was available, the door would be at least

9 cracked open?

10   A   No, sir. It was locked usually because we'd have

11 to get the key. There's been a few times that it's been

12 open, but very seldom.

13   Q   Okay.

14   A   It's locked.

15   Q   On this occasion, we did not have to go find an

16 employee?

17   A   No, sir.

18   Q   Okay. Did you have to turn a light on?

19   A   That, I don't remember. I'm--I'm almost sure I did

20 because usually when I went in before I do, but I--

21   Q   Okay. All right. When it's not in use, they turn

22 the light, usually?

23   A   Yes, sir.

24   Q   Okay. Now, when you turned the light on, did you

1   have any trouble seeing around in the bathroom any?

2   A   No, sir.

3   Q   Okay.

4   A   It's dull, but it's not dark.

5   Q   Okay.  Not the brightest light?

6   A   No, sir.

7   Q   Okay.  But enough that you can see what you're

8   doing?

9   A   Oh, yes, sir.

10   Q   Had you ever had any concerns walking into that

11   bathroom before, just based on the lighting?

12   A   No, sir.

13   Q   Okay.  And you think the lighting gives you an

14   opportunity to see whatever could be on the floor?

15   A   Yes, sir.

16   Q   Okay; okay.  Now, this bathroom, it's shaped kind

17   of like a cube, with the commode--

18   A   Yes.

19   Q   --on the left and the sink on the right?

20   A   The sink's--yes, sir--sink's on the right when you

21   come in the door, and then the toilet's on the left.

22   Q   Okay.  And what kind of floor is that?

23   A   I don't--  It was hard.

24   Q   Okay.

25   A   I don't know if it was tile or concrete.

1     Q      Okay.

2     A      I just—I'm not sure on that part.

3     Q      Okay.  That's fair.

4     A      Okay.

5     Q      When you were walking in, where did you walk to?

6     A      I walked right to the toilet.

7     Q      Okay.  And when you entered the restroom initially,

8     and while you were traversing to the toilet, did you

9     encounter anything slippery?

10    A      No, sir.

11    Q      You made it safely to the toilet?

12    A      To the toilet.

13    Q      Okay.

14    A      Yes, sir.

15    Q      And then did you begin to do some business there?

16    A      Yes, sir.

17    Q      Okay.  We're going to be tactful about this.  Okay?

18    And while you were sitting there for that moment, did you

19    notice anything on the floor at that time?

20    A      No, sir.

21    Q      Okay.  To your recollection, did the bathroom

22    appear to be clean and orderly?

23    A      To my recollection, yes, sir.

24    Q      Okay.  No paper towels, no trash on the floor,—

25    A      No, sir.

1    Q    —or nothing like that? Okay.  All right.  And

2    then you finished what you came to do?

3    A    Yes, sir.

4    Q    Okay.  Did you make it standing up?

5    A    Yes, sir.

6    Q    Okay.  And then were you able to get your garments

7    in order?

8    A    No, sir.

9    Q    Okay.

10   A    Right—.  Do you want me to—

11   Q    We are at that point.

12   A    Excuse—

13   Q    Yes, ma'am.

14   A    Okay.

15   Q    That's the next question is:  Okay.  So you stood

16   up—

17   A    And I—yeah—and I reached over for the toilet

18   tissue, and then I started—I started to slipping and doing

19   the splits and kept—kept on and I knew I was going to—knew

20   I was going to fall.  Do you want me to keep on—on saying

21   what happened—

22   Q    Well, we—

23   A    —or what?

24   Q    Well, how about we just develop it a little bit at

25   a time?  That way—

1    A    Okay.

2    Q    --we all have a good picture--

3    A    Okay.

4    Q    --of it.    Okay?

5    A    All right.

6    Q    You're doing wonderful, by the way.

7    A    Okay.  Thank you.

8    Q    You're doing wonderful.  I got to say, you're

9    probably one of the better detailed witnesses I've had in

10   awhile, so I appreciate.

11   A    Thank you.

12   Q    You're doing a wonderful job.  Okay.  So we are

13   with our legs standing in front of the commode, just stood

14   up, reached for tissue, and then you feel like you're doing

15   the splits?

16   A    Yes, sir.

17   Q    Okay.  As you're standing right in front of the

18   commode?

19   A    No, sir.

20   Q    Okay.

21   A    It's over where the toilet tissue is, which is a

22   little ways from the commode--

23   Q    Okay.  So you kind of have to--

24   A    --from the toilet.

25   Q    --get up to reach the toilet paper?

```
 1        A    Yes, sir.  I'm already standing.

 2        Q    Right.

 3        A    Yes, sir.

 4        Q    Right.  But are your pants back up or are they

 5   still--

 6        A    No, they're not.

 7        Q    Okay.  That's what I'm just trying to understand.

 8        A    Yes, sir.

 9        Q    So we essentially have our capris at our ankles?

10        A    Yes, sir.

11        Q    Okay.  All right.

12        A    They wasn't at my ankles, but--

13        Q    Down below--

14        A    Half.

15        Q    --around--

16        A    Half.  Yeah.

17        Q    --knees or--

18        A    Halfway.

19        Q    --thereabouts?

20        A    Yes, sir.

21        Q    Okay; okay.  And I know that, you know, some of

22   these are getting a little--

23        A    Yes, sir.

24        Q    We're skirting the delicate--

25        A    Uh-huh (yes).
```

1   Q   Okay.  We're trying to be like a surgeon here--

2   A   All right.

3   Q   --and just cut out what we don't need.

4   A   Yes, sir.

5   Q   So we stand.  We have to reach for tissue?

6   A   Yes, sir.

7   Q   Okay.  And at that point, you feel your feet

8       moving?

9   A   Yes, sir.

10  Q   Okay.  Now, were your feet, at this time, in the

11      same position they were while you were seated?

12  A   No, sir.

13  Q   Okay.  So you had to--

14  A   Because I had--  Yeah.  I was--

15  Q   Go ahead and tell me.

16  A   I was up--standing up, and then reaching for the

17      tissue.

18  Q   Okay.  So did we find of take a little step to the

19      left or--

20  A   I started to--

21  Q   --to the ri- --

22  A   --slide and I don't remember taking any steps, but

23      my foot just started--

24  Q   Okay, okay.  So what I'm trying to understand is,

25      as you stand up from the commode, --

1     A    Yeah.

2     Q    —did you have to take a step at all to—

3     A    Oh. I did take a step. Yes, sir.

4     Q    Okay.

5     A    I see what you're talking about.

6     Q    Yes, ma'am.

7     A    I did, to reach the paper.

8     Q    Okay. Now, things get a little backwards here,

9     because as you're walking in the commode's on your left, but

10    as you're sitting on the commode, facing out, the wall that

11    had once been your left is now on your right.

12    A    Yes.

13    Q    Okay. So what I'm going to ask this question is,

14    did you step to your right now, at that point, to reach the

15    tissue, which would be—

16    A    I'm trying to—

17    Q    —the left wall as you enter the bathroom, but now

18    on your right?

19    A    I just—I don't recall.

20    Q    Okay.

21    A    I—I don't recall on that.

22    Q    Okay.

23    A    I mean, I had to step to get it, but I don't—

24    Q    Okay. And then you start slipping?

25    A    Yes, sir. But I started slipping with my left—

1    left foot--leg.

2        Q    Okay.  Now, your pants are kind of in a difficult

3    position because they're around your knees or thereabouts, so

4    you're not, I guess, technically able to do the splits then,

5    are you?

6        A    Oh, yes, sir.

7        Q    Okay.

8        A    I did.  I started to--when I knew I was falling.

9        Q    Okay.  I'll tell you what.  So you start slipping

10   with your left foot?

11       A    Yes, sir.

12       Q    Forward, backward, or to the side?

13       A    To the side.

14       Q    Left side, right side?

15       A    Left side.

16       Q    Okay.  All right.  Now, let me ask you this:  As

17   you're reaching, do you put more weight on one foot versus

18   the other to reach over or do you--

19       A    No, sir.

20       Q    Okay.  Did you like take a step, and then kind of

21   bend and reach or were you standing up straight when you were

22   reaching?

23       A    I'm trying to think of how, you know--  I--let's

24   see--if I didn't bend--I had to bend just a little, but I'm

25   leaning over just a little.  I'm not really bent.

1    Q   Okay.  Leaning just a little bit toward the right?

2    A   Yes, sir.  Toward-- Yes, sir.

3    Q   Okay.

4    A   But I--

5    Q   Now, I don't mean to be grotesque with this next

6    one.

7    A   That's all right.

8    Q   The position of the toilet paper, was that--you had

9    to--was the plan to acquire some paper, and then go back to

10   the commode and sit back down?

11   A   No, sir.

12   Q   Okay.  But had you used any paper before standing

13   up?

14   A   Yes, sir.

15   Q   Okay.  That's what I--

16   A   Yes, sir.

17   Q   Okay.  I'm with you.

18   A   All right.

19   Q   What was the purpose of reaching the paper at this

20   point?

21   A   When I first got there?

22   Q   No.  Once--

23   A   I mean, when I--

24   Q   --once you were up with your pants still around

25   your knees, what was the purpose of reaching for the paper?

1    A    I don't know how I'm supposed to word this,--

2    Q    No. That's--

3    A    --but like you--when you get through, you--

4    Q    Right.

5    A    --reach for the paper.

6    Q    Okay.

7    A    Is that--

8    Q    I think we just had a miscommunication then, --

9    A    Okay.

10   Q    --because while you're sitting on the commode,--

11   A    Yeah.

12   Q    --you cannot physically reach the paper from there.

13   Is that what you're telling me?

14   A    Yeah, I can.

15   Q    Okay.  So then I'd ask, and maybe you

16   misunderstood, while you're still sitting on the commode,

17   before you stood up, did you reach for and get paper?

18   A    I don't recall on that.

19   Q    I've got a nine-year-old daughter, so I'm just

20   going to ask it--

21   A    Okay.

22   Q    --this way:  Did you wipe before you got up?

23   A    Yes.

24   Q    Okay.  And then you got up?

25   A    And then again when I'm standing up.

```
 1    Q    Okay.  You're going to wipe again?

 2    A    Yeah.

 3    Q    I got you.

 4    A    Okay.

 5    Q    Okay.

 6    A    All right.

 7    Q    Yes, ma'am.  Very good.  Okay.  Now I'm with you.

 8    A    Okay.

 9    Q    So you were kind of in between finishing the job?

10    A    I had finished, --

11    Q    Right.

12    A    --and I was standing up to just get some more

13    paper, --

14    Q    Get some more paper.

15    A    --and that's--

16    Q    Okay.  Right.  Okay.

17    A    All right.

18    Q    Very good.  Then our left foot starts slipping to

19    the left as we're reaching a little bit toward the right?

20    A    Yes.

21    Q    Okay.  Once your left foot began to slip, what

22    happens next?

23    A    I just start going clear across that floor,

24    trying--I'm standing, but when my leg is slipping, I'm trying

25    to brace myself so I won't fall, but I couldn't even get--I
```

1    couldn't even get my hand on the wall or anything.

2        Q        Okay.

3        A        It was so fast.

4        Q        Now, they've got that handicap rail in there, don't

5    they?

6        A        I'm--I'm just not sure on that.

7        Q        Okay; okay.  You don't remember seeing a rail to

8    reach for on the wall?

9        A        No, sir.

10       Q        Okay.  So you start slipping toward the left?

11       A        Yes.

12       Q        Your left foot first, and then does your right foot

13   start slipping as well?

14       A        It was just mostly my left foot.  It was like doing

15   the splits, and then it was--everything was just in slow

16   motion.

17       Q        I got you.

18       A        I was slipping.

19       Q        Okay.  And then you began slipping.  What happens

20   next?  You fall down?

21       A        I fell, and I knew I was falling because I couldn't

22   stay up straight, and I used this right arm to--so I would

23   hit on it, but I still--I hit hard, but I still hit my head

24   real hard, and neck.

25       Q        Okay.  And you're describing your right arm and the

```
 1   right side of your head.  Is that correct?
 2        A    It was all on my he- --all at the back of my head
 3   because, when I fell, I hit on my right arm, but I hit real
 4   hard on the back of my head.
 5        Q    Okay.  And at this point, we still have our capris
 6   by our knees?
 7        A    They're about halfway.
 8        Q    Halfway?
 9        A    Yes, sir.
10        Q    Okay.
11        A    They're not at my knees, but--
12        Q    Above your knees?
13        A    Yes, sir.
14        Q    Okay.  Got you.  At this point, you call for your
15   husband?  What happens?  What do you do?
16        A    I called him, but he didn't hear me.
17        Q    Okay.
18        A    He was at the back, going to wait on me, before we
19   left--before we checked out, and I hollered again, and then
20   later--not much later, I kept hollering and he--he heard me.
21   And he couldn't get the door unlocked because I--you know, I
22   locked it, so he jiggled it and got in and that's where he
23   saw me.
24        Q    Had you finished re-robing by that point, while
25   you're still on the floor?
```

1  slipped, so now we're on the floor.  Were you able to observe

2  or feel anything on the floor, while you were on the floor?

3      A   I kept trying to move and I couldn't, and it felt

4  wet.

5      Q   Okay.  Where did--

6      A   I couldn't see anything because I couldn't lift my

7  head or--

8      Q   All right.  Where did it feel wet?

9      A   Right at my legs and all.

10      Q   Did your pants get wet?

11      A   N--I don't recall on that.

12      Q   All right.  So while you were in there by yourself,

13  you feel something wet on the floor, but you're having a hard

14  time moving around, is what you're saying?

15      A   Yes, sir.  I--I couldn't move.

16      Q   Okay.  When your husband comes in, what does he do?

17      A   Oh.  It shocked him, but he was trying to move me.

18  I said, "I can't move."  What was hurting was my--all my arm

19  and all and my wrist,--

20      Q   Okay.  And this is on your right?

21      A   --but my--and my--   Right.  Everything was on my

22  right side, and then my head was what was killing me.

23      Q   Okay.  And then he tried to get you up, but you're

24  not ready to get up?

25      A   He tried, but he--the more he tried to get me up,

1   he couldn't.  My legs kept slipping and he went and got the
2   manager--or assistant.  I'm not sure what she is.  Assistant
3   manager.
4        Q.   Okay.  Now, at what point were you able to cover
5   yourself?
6        A.   When my husband come in, I asked him would he snap
7   my jeans.  That's how come I remember they were jeans,
8   because they snapped.  I didn't want anybody seeing me.
9        Q.   Yes, ma'am.  All right.  So he goes to get the
10  female--
11       A.   Yes, sir.
12       Q.   --manager?
13       A.   Yes.
14       Q.   The one who we described earlier?
15       A.   Yes, sir.
16       Q.   Okay.  The one you'd seen on prior occasions at the
17  store?
18       A.   Yes, sir.
19       Q.   Okay.  And she came into the bathroom?
20       A.   Yes, sir.
21       Q.   Did anyone else come with her?
22       A.   No, sir.  Not at the ti- --not at that time.
23       Q.   Okay.  And what did she do when she came in?
24       A.   She got real upset and was worried about me.
25       Q.   Okay.  What did you talk about?

1    A    That I was hurting. She wanted to know if I was

2    hurt.

3    Q    Okay. Did she discuss what was on the floor or

4    where it came from?

5    A    Oh, yes, sir.

6    Q    What did she say?

7    A    She said that it was water all on the floor.

8    Q    Did she say where it came from?

9    A    She said that somebody had mopped.

10   Q    Did she say when that person had mopped?

11   A    No, sir.

12   Q    So we don't know how long that had been there?

13   A    No, sir.

14   Q    Okay. You'd been in the store for about a half

15   hour and didn't see anybody back there mopping, did you?

16   A    No, sir.

17   Q    Okay. All right. When you were in there, did you

18   feel around again, when the manager was there, to see what

19   was on the floor or--

20   A    No, sir. I cou- --I was hurting.

21   Q    Okay. Now, you said initially it was just her.

22   Did someone else come into the bathroom afterwards?

23   A    Yes, sir. I guess they heard about it, so they

24   come--the black checker that, you know, I had said ear- --

25   mentioned earlier, she come at the door, and then the little

1  that same spot or is this a--

2  A    No, sir.

3  Q    Okay.  All right.  Now, this spot's kind of in

4  front of the commode, though?

5  A    Yes, sir.

6  Q    About a step or so--

7  A    It's a little--it's over because when I stood up

8  for the tissue paper, which like--you know, I could reach the

9  tissue paper, but you still got to, you know, reach over, and

10 this was a little farther from there, so I didn't have to go

11 that way.  When I come in, I went around just like I always

12 do.  Go in the door and go--

13 Q    Just go straight to it?

14 A    Yes, sir.

15 Q    And this is a little bit--    As your--

16 A    This is over.

17 Q    Okay.

18 A    Yes, sir.

19 Q    As your back is to the commode, it's a little bit

20 to the right, then?

21 A    Is my back--    No.  My back wasn't toward the

22 commode.  It--I fell across, over from the commode.

23 Q    I understand,--

24 A    Yes, sir.

25 Q    --but what I'm trying to say--

1    A    No, sir.

2    Q    Did she tell you that she was one that typically

3    maintained that bathroom?

4    A    No, sir.

5    Q    To your recollection or understanding, was it just

6    that one spot that was wet?

7    A    To my recollection.  Because I kept trying to move

8    my legs to get up and they kept sliding.  I couldn't--

9    couldn't get up.

10   Q    And do we know how large this wet spot was?

11   A    No, sir.  It had--  Can I say something--

12   Q    Yes, ma'am.

13   A    --right now?  It had to be a lot of water because

14   my husband was getting paper towels and wiping it up, so I

15   could try to get up, and when the man-  --when she come in and

16   she saw all that, too, and she started using the paper towels

17   to help him.

18   Q    Okay.  Was the toilet leaking?

19   A    No, sir.

20   Q    Was the sink leaking?

21   A    No, sir.

22   Q    The stocker, he never came in and felt around on

23   the floor?

24   A    No, sir.

25   Q    All right.  Did an ambulance come to the scene?

1   Q   The manager, she didn't tell you she had mopped?

2   A   No, sir.

3   Q   And you never talked to the checker or the stocker?

4   A   No, sir.

5   Q   As we sit here today, do you know how long that

6   water had been on the floor before your accident?

7   A   No, sir.

8   Q   As we sit here today, do you have any personal

9   knowledge, other than the conversation you had with the

10   manager, as to how it got there?

11   A   No, sir.

12   Q   In other words, you didn't observe them mopping?

13   A   No, sir.

14   Q   Okay.  After the accident, do you continue to use

15   that same pair of shoes?

16   A   I cannot reme- --yes, sir, I did.  Sure did.

17   Q   Did you have any problems with them?

18   A   No, sir.

19   Q   And I'm guessing that you didn't have medications

20   that would make you drowsy or anything like that, that day?

21   A   No, sir.

22   Q   Okay.  Or any kind of alcohol or anything like

23   that?

24   A   No, sir.

25   Q   I didn't figure, but I do have to ask.

but the store had already closed and he couldn't get anybody.

1    Q    Okay.  Do you know Mark Mason?

2    A    No, sir.

3    Q    Okay.  The lawsuit that you filed names him as one

4    of the defendants.

5    A    Okay.

6    Q    Okay.

7    A    If he's the--is he the manager--

8    Q    Yes, ma'am.

9    A    --I believe?

10   Q    He is the store manager.

11   A    Okay.  Now, I remember--not th- --not that night,

12   but when we'd been in there before, he--I don't know if it's

13   him, but it's--it may be.  He's the only black man that I saw

14   and he seemed like he was the manager, but I don't know.

15   Q    Okay.

16   A    And--

17   Q    And I know some of this is pleadings that your

18   attorney helped with, but I have to know if you have any

19   information on this topic.  One of the allegations was that

20   Mr. Mason didn't do a good job training his employees.  Okay?

21   And I've got to ask you about that.  What knowledge do you

22   have about the training practices used by Mr. Mason for his

23   store employees?

24   A    I don't--I don't know on that.  I don't--

25

1  Q    Okay.  As we sit here today, do you have any

2  personal knowledge that Mr. Mason refused to follow any store

3  training protocols in teaching his employees about slip and

4  fall accidents?

5  A    I don't know because I don't know him, --

6  Q    Yes, ma'am.

7  A    --unless I've seen him, but I don't--I don't know

8  him or know his--even knew his name.

9  Q    Okay.  That's just not a topic you have any

10 knowledge of?

11 A    No, sir.

12 Q    Just had to check.

13 A    All right.

14 Q    Was he even at the store when this happened?

15 A    No, sir.

16 Q    Do you know if he was at the store when you first

17 got there?

18 A    I didn't see anybody else except the one I was

19 telling you, the--

20 Q    The younger--

21 A    --you know, the young--

22 Q    --gentleman?

23 A    Yeah.

24 Q    Yes, ma'am.

25 A    The one--the girl that we would always see before.

1    A    No, sir.

2    Q    Do you know what the typical store practice is for

3  when they mop?

4    A    We would see a sign up saying, "Wet Floor."

5    Q    All right.  Do you know if they would mop like

6  whatever needed to be mopped during the day or if they'd do

7  it at night or how they did that?

8    A    No, sir.  I don't know.

9    Q    Okay.  All right.  Let's start talking about your

10  medical history.  This should probably be pretty brief, but--

11  who is your family physician?

12    A    Dr. Carter Cox in Bastrop.

13    Q    Okay.  How long has he been your doctor?

14    A    I guess probably forty--I'm really not s- --

15  probably forty-something years.

16    Q    Okay.  In the last three years prior to the

17  accident, how many times would you have been to see him?

18    A    The last three years?  I would--maybe, for a cold or

19  something like that.  I'd say--I don't--I don't really know

20  how many times, --

21    Q    That's fair.

22    A    --but--

23    Q    Do you use any other doctors, other than Dr. Cox?

24    A    No, sir.

25    Q    Okay.  Does he take care of all of your health

ORIGINAL

STATE OF LOUISIANA   *   PARISH OF MOREHOUSE

FOURTH JUDICIAL DISTRICT COURT

RUTHIE TULLY AND
JOHN TULLY

VERSUS                                      NO. 2014-296
                                            SECTION "1"

DOLLAR TREE STORES, INC.
AND MARK MASON

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF

JOHN TRAVIS TULLY, JR.

September 30, 2014

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Taken At the Law Offices Of:

Duncan M. Jones
1315 Cypress Street
West Monroe, Louisiana 71291

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Reported By:

MARGARET ANN COPELAND
CERTIFIED COURT REPORTER
CERTIFICATE NO. 92160
PARISH OF OUACHITA
STATE OF LOUISIANA

EXHIBIT
B

1    A    Yes, sir.

2    Q    Okay.  And was it discharged like right after being

3  filled?  In other words--

4    A    It was--

5    Q    --opened and closed?

6    A    Right.

7    Q    Okay.  Nothing pending now, as of this date?

8    A    No, sir.

9    Q    Okay.  What position did you reach with IP?  What

10 was your job title?

11   A    I was a general mechanic, maintenance.

12   Q    All right.  Did that require any kind of degree or

13 was that--

14   A    No, sir.  It was just working from the bottom up.

15   Q    I understand.  Hard work and sweat.

16   A    Right.

17   Q    Got you.  That's the American way.

18   A    Yes, sir.

19   Q    Okay.  You were with your wife at the store on the

20 day of the accident?

21   A    Yes, sir.

22   Q    And the papers filed by your attorney, it said

23 December 19, 2013.  Do you believe that's the correct date?

24   A    Yes, sir.

25   Q    Okay.  Do you remember what day of the week it was?

1    A    No, I don't.

2    Q    No problem.  How often would you go to the store

3    with your wife?

4    A    Most every time she would go, I'd be with her.

5    Q    Okay.  I didn't ask her this, and I know she had a

6    driver's license, but would you typically drive?

7    A    Yes.

8    Q    She's able to drive on her own,--

9    A    Yes.

10   Q    --but when you're together, you drive?

11   A    I drive.

12   Q    Okay.  She had mentioned looking for cards and

13   Christmas bags.

14   A    Yes, sir.

15   Q    Is that correct?

16   A    That's right.

17   Q    Do you remember any other items that we're

18   purchasing that day?

19   A    Not that I know of.

20   Q    And I didn't ask your wife this, but-- Well, I

21   think we kind of did in a roundabout way.  But did we

22   complete our purchase that day before leaving the store?  In

23   other words, did we leave with merchandise or--

24   A    No, sir.

25   Q    Okay.  Do you recall about what time you had gotten

1      to the store that day?

2   A      It was in the evening around 5:00, I believe.

3   Q      And how long were we in the store?

4   A      At least thirty-five, forty minutes.

5   Q      When you first walked in, what employees did you

6      see?

7   A      The girl checking out.

8   Q      Okay.  The African-American female?

9   A      No, sir.  The white female.

10   Q      The white female.

11   A      She greeted us when we come in.

12   Q      Okay.  What other employees did you see in the

13      store while you were present?

14   A      1 seen one black male stocking, and the other black

15      female I didn't see.

16   Q      Okay.  So the two you're aware of is the white

17      female your wife described as being like a manager—

18   A      Yes, sir.

19   Q      —and then the African-American male that was doing

20      the stocking?

21   A      Right.

22   Q      Okay.  And he was stocking the entire time you saw

23      him?

24   A      Yes, sir.

25   Q      Okay.  Did you see the manager doing anything,

```
 1      other than working up front at the cash register?

 2          A      No, sir.

 3          Q      Okay.  Now, at some point while you're there, your

 4      wife decides to stop by the back corner of the store to use

 5      the restroom?

 6          A      Yes, sir.

 7          Q      Okay.  And this is like a little area that's back

 8      left corner of the store?

 9          A      Yes, sir.

10          Q      Okay.  Had you been in the men's bathroom back

11      there before?

12          A      Yes, sir.

13          Q      Okay.  And you'd had to walk past the women's

14      bathroom to get to it?

15          A      Yes, sir.

16          Q      Okay.  And is it correct to say that they're on the

17      left wall in the back corner of the store?

18          A      Yes, sir.

19          Q      Okay.  In that open area?

20          A      Right.

21          Q      Okay.  And in the times that you'd gone to the

22      men's bathroom, had you ever had any problems with it?

23          A      No, sir.  Just going--having to go back up and get

24      the key.

25          Q      Okay.  Would you always have to get a key?
```

1      A       No.   Not always.   Eve- --   Well, the times I've
2  been in there, one time they had a—had it wedged open.
3      Q       Okay.   Had you ever had any problems with how the
4  bathroom was kept, insofar as whether it was neat and clean?
5      A       No, sir, I hadn't.
6      Q       Okay.   Do you recall what kind of floor the
7  bathroom has?
8      A       It's either tile or concrete, one of them.   I
9  couldn't—I don't really pay that much attention to what
10  the—
11     Q       I understand.   It's not your bathroom.
12     A       No.
13     Q       Okay.   Pay more attention to whether it's dirty or
14  not, --
15     A       Right.
16     Q       --as opposed to what it is?
17     A       Right.   Like the commode and sink, I would.
18     Q       Right.   Absolutely.   Okay.   Now, your wife went
19  into the ladies' bathroom on this incident.   Where were you?
20     A       I went around to where the automotive aisle was and
21  looked through there, and then come back around and she was—
22  I heard her.   I could barely hear her hollering.   And she
23  said—asked me where I'd been and I told her I'd been gone.
24  But she had fell.   And that moment I got my knife out and
25  tried to—and jimmied the door open.

1    Q    Got you.  Okay.  Let me ask you just a couple more

2  lead-up questions.  For the thirty, thirty-five minutes we'd

3  been in the store, had you seen any employees in the bathroom

4  areas doing any cleaning?

5    A    No, sir.

6    Q    Am I correct in saying that the employees would

7  have been busy either stocking or ringing up customers during

8  that time?

9    A    Yes, sir.

10    Q    And this is right before Christmas.  The store's

11  pretty busy?

12    A    It wasn't that many-- I would say six people in

13  there.

14    Q    Okay.  If the white female had left the checker

15  stand and gone toward the back to go mop a bathroom, do you

16  think you would have probably seen her do that?

17    A    Yes, sir.

18    Q    Okay.  All right.  So we walk over by the

19  automotive area, come back around, hear your wife hollering,

20  pull out your pocket knife and you're able to get the latch

21  on the door to open up,--

22    A    Yes, sir.

23    Q    --gain access to the bathroom,--

24    A    Yes, sir.

25    Q    because the door was locked?

```
 1      A       Right.

 2      Q       Okay.  Once you're inside the ladies' bathroom,

 3   what do you see?

 4      A       I seen her laying on the floor, her head at an

 5   angle facing the door, and she was complaining about her head

 6   and her shoulder and she couldn't get up.

 7      Q       Okay.  Were her feet toward the door or toward the

 8   toilet?

 9      A       Toward the toilet.

10      Q       Was she on her back or on her front or on her side?

11      A       On her side.

12      Q       Which side?

13      A       Right side.

14      Q       Okay.  You had to help her pull her pants up?

15      A       Yes, sir.  And button them for her.

16      Q       Did she tell you what had happened?

17      A       Said she had got up and started to reach for the

18   paper and she--her foot started sliding with her.  She'd just

19   done the splits, couldn't stop and hit the floor to-- Said

20   her head hit hard, you know, and her shoulder, too, but it--

21      Q       All right.  Did you look around the floor to see if

22   it was wet?

23      A       Well, not-- When she said she couldn't get up, she

24   was trying to use her feet to get up and I reached down, it

25   was wet around her feet and up close to her ankles and all,
```

```
in that area.

 1    Q   How big an area was it that was wet?

 2    A   I'd say three foot.

 3

 4    Q   All right.  Could you see a difference in the floor

 5  or only feel it?

 6    A   Feel it, because it seemed--  Well, I was just

 7  focused, you know, on her and really wasn't paying attention

 8  to anything.  So at that time, I got up and got towels and

 9  tried to mop--you know, get it up to where she could get up.

10    Q   All right.  And at what point did we go get the

11  manager?

12    A   After I got her britches up and kind of mopped up

13  just a little bit and tried to get her up, I couldn't, so I

14  went and got the manager.

15    Q   Okay.  Did the substance on the floor have any

16  chemical smell to it, like--

17    A   No, sir.

18    Q   --cleaner or something like that?

19    A   No, it didn't.

20    Q   Okay.  Did it have any odor at all?

21    A   No, sir.

22    Q   Was it clear?

23    A   I couldn't tell you if it was clear or colored.

24    Q   You got the manager.  Did she come back with you?

25    A   Yes, sir.
```

Duke Copeland Court Reporters
P.O. Box 4171, Monroe, LA 71211   Tel: 318-387-2809 Fax 318-387-3271

15

1    Q    All right.  Did she come into the bathroom?

2    A    She come in the bathroom.

3    Q    And what did she do?

4    A    She told her--I told her what happened, and she

5    said, "Well, we just mopped the floor," but there was no sign

6    up that they had done that.

7    Q    Did she say how long it had been since they'd

8    mopped the floor?

9    A    No, sir.  She didn't say how long, and she--

10   Well,--

11   Q    Okay.

12   A    After that, we--I got more towels and she helped me

13   get more towels to try to get it dry enough to where I--we

14   could get her up.

15   Q    To your knowledge, had they mopped any while you

16   were in the store?

17   A    No, sir.

18   Q    Okay.  So that would have had to have been before

19   you entered the store that--

20   A    Yes, sir.

21   Q    --if any mopping was done?

22   A    Right.

23   Q    Do you know for a fact that whatever was on the

24   floor did come from mopping or just as best you know, it's

25   from what she said?

1    A    Right.  That's what she said.

2    Q    Okay.  You don't know how long it had been there on

3    the floor?

4    A    No, sir.

5    Q    Okay.  And whether it was in fact from mopping or

6    something else, you don't know for sure?

7    A    No, sir.

8    Q    Okay.  Do you know any of the store policies about

9    when they mop or for what reasons?

10    A    No, sir, I don't.

11    Q    Okay.  Do you know any of the store policies or

12    training on how they mop or what techniques they use?

13    A    No, sir.

14    Q    Okay.  Do you know if there's any schedule as to

15    when the floor's mopped?

16    A    No, I don't.

17    Q    Okay.  Mr. Mason, your wife and I discussed him.

18    He's an African-American male that is the manager?

19    A    Yes, sir.

20    Q    Okay.  You know who I'm talking about?

21    A    Yes, sir.

22    Q    Okay.  Do you know him personally, outside of the

23    store?

24    A    No, I don't.

25    Q    Okay.  And you just know who I'm talking about,

1    referring to the main manager?

2        A    Right.

3        Q    Okay.    Do you know anything that he did in

4    connection with the water being on the floor?

5        A    No, I don't.

6        Q    Okay.    Do you know about any training that he gave

7    any of his employees?

8        A    No, sir.

9        Q    Do you know of any mistakes that he made in

10   training his employees?

11       A    No, sir.

12       Q    Do you know whether or not he failed to follow any

13   store training or protocol in training his employees?

14       A    No, I don't.

15       Q    Okay.    Was he in the store at the time?

16       A    No, sir.

17       Q    Had he been in the store when you arrived?

18       A    No, sir.

19       Q    Did you speak to any of the other store employees

20   about the mopping or where the water came from or anything of

21   that nature?

22       A    No, sir, I didn't.

23       Q    All right.    Did any of the other store employees

24   give any input as to what happened?

25       A    No, they didn't.

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                          SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____                 _____
                                                                    DEPUTY CLERK

AFFIDAVIT

STATE OF LOUISIANA

PARISH OF MOOREHOUSE

BEFORE ME, through undersigned authority, personally came and appeared Mark Mason, who being by me first duly sworn, stated:

1.    That, at all times relevant herein, affiant was and is the store manager of Dollar Tree Store number 1886, located at 5997 Mer Rouge Road, Bastrop, LA.

2.    That affiant had been an employee of Dollar Tree for about 12 years before the alleged accident, and had been provided training materials from Dollar Tree. Affiant did not set the training policy for Dollar Tree, but instead adhered to store policies set forth by the corporate level.

3.    As the store manager, affiant directs training of all employees of this store, through materials provided by Dollar Tree Inc. including a video training system for new employees, and monthly training for all employees.

4.    That the topics for training are provided by Dollar Tree Inc.

5.    That all of the employees present at Store 1886 on the day of the alleged accident had been provided with the initial training and also received additional training on prevention of slip and fall accidents.

6.    That affiant was present in the store on the date in question, but had just left about 30 minutes before the accident allegedly occurred. During his time at the store, he did not mop, and was not aware of any other employees who mopped the ladies restroom located at the rear left of the store within the several hours before the alleged accident.

7.    That store policy is to mop the floors of the store outside of store hours, unless a spill is found. In that case, the spill is mopped up, and the floor is then dried with paper towels and a wet floor sign is placed until the floor is dry.



EXHIBIT
C

8.     That affiant had no knowledge of any foreign substances on the floor prior to the alleged accident.

_Mark Mason_
Mark Mason

SWORN TO AND SUBSCRIBED
BEFORE ME, on this _____ day
of _____, 2015.

Notary Public (Bar/Notary # _____)
_____ Parish, Louisiana

J. MICHAEL NASH
NOTARY PUBLIC CADDO PARISH
LA COMMISSION IS FOR LIFE
BAR# 27021

4TH JUDICIAL DISTRICT COURT – PARISH OF MOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                              SECTION "C"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____        _____
                                        DEPUTY CLERK

AFFIDAVIT

STATE OF LOUISIANA

PARISH OF MOREHOUSE

BEFORE ME, through undersigned authority, personally came and appeared Colleen Laing, who being by me first duly sworn, stated:

1.  That, at all times relevant herein, affiant was the assistant manager of Dollar Tree Store number 1886, located at 5997 Mer Rouge Road, Bastrop, LA.

2.  That affiant had been an employee of Dollar Tree for about 4-5 years before the alleged accident.

3.  Affiant attended initial training upon her hire with Dollar Tree, and attended monthly training meets to receive training on materials provided by Dollar Tree Inc.

4.  That affiant was present in the store on the date in question, and was on duty as the assistant manager.

5.  That store policy is to mop the floors of the store outside of store hours, unless a spill is found. In that case, the spill is mopped up, and the floor is then tried with paper towels and a wet floor sign is placed until the floor is dry.

6.  That affiant was the employee responsible for maintaining the ladies restroom at the store. This was the only restroom available to affiant, and affiant was very particular about its cleanliness both for her use and for the safety of customers.

7.  That affiant did not mop the ladies room at Dollar Tree during the several hours before the alleged incident reportedly occurring on December 19, 2013, involving regular customer Ruthie Tully.

8.  That, had affiant mopped the floor of the restroom that day, she would have also used paper towels to dry the floor and place wet floor signs until the floor was dry.



EXHIBIT

12791_20141126_Affidavit_Laing_AFF3.jpg

9.     That affiant had no knowledge of any foreign substances on the floor prior
to the alleged accident.

_____
Colleen Laing

SWORN TO AND SUBSCRIBED
BEFORE ME, on this 12th day
of March 2015.

_____
Notary Public (Bar/Notary# 27021
_____ Parish, Louisiana

J. MICHAEL NASH
NOTARY PUBLIC CADDO PARISH
LA. COMMISSION IS FOR LIFE
BAR# 27021

[729]_20141126_Affidavit_Laing_MJS_jmn

JUN/23/2015/TUE 12:26 PM    Richard Fewell Jr.              FAX No. 318-388-3337              P. 001

STATE OF LOUISIANA    "PARISH OF MOREHOUSE" FOURTH DISTRICT COURT

RUTHIE TULLY and JOHN TULLY

VERSUS NO. 2014-296                    FILED: _____

DOLLAR TREE STORES, INC. and          _____
MARK MASON                            DEPUTY CLERK OF COURT

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes and appears petitioners,

RUTHIE TULLY and JOHN TULLY, major domiciliaries of Morehouse Parish, Louisiana, who

submit this OPPOSITION TO MOTION FOR SUMMARY JUDGMENT for the following

reasons:

1.

There exists a genuine issue of material fact which precludes the summary judgments

sought by the defendants herein.

2.

Your petitioner, Ruthie Tully, sustained injuries as a result of a slip and fall at the Dollar

Tree in Bastrop, Louisiana, causing her to suffer injuries to her head, neck, wrist and right

shoulder.

3.

The attached affidavits of plaintiffs are supportive of their position that there was water

on the floor at the time of this accident, which makes summary judgment inappropriate.

4.

Further, plaintiffs are unaware of the evidence concerning Harrah's or FSS mentioned in

defendant's statement of Undisputed material facts, more specifically paragraphs 3-7, and must

conclude that these are unintentional typographical errors pertain to another case.

WHEREFORE, plaintiffs, Ruthie Tully and John Tully, pray that defendant's motion for

summary judgment be denied.

RESPECTFULLY SUBMITTED:

**RICHARD L. FEWELL, JR.**
**DUNCAN M. JONES**
1315 Cypress Street
Post Office Box 1437
West Monroe, LA 71294
Telephone: (318) 388-3320
Facsimile: (318) 388-3337

BY: _____
DUNCAN M. JONES
Bar Roll #24935
ATTORNEYS FOR PETITIONERS

STATE OF LOUISIANA * PARISH OF MOREHOUSE* FOURTH DISTRICT COURT

RUTHIE TULLY and JOHN TULLY

VERSUS NO. 2014-296

DOLLAR TREE STORES, INC. and                          FILED: _____
MARK MASON
                                                      DEPUTY CLERK OF COURT

MAY IT PLEASE THE COURT:

**MEMORANDUM IN SUPPORT OF OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT**

        RUTHIE TULLY and JOHN TULLY, plaintiffs in the above captioned matter,
respectfully opposes the Motion for Summary Judgment filed herein by defendants, Dollar Tree
Stores, Inc. and Mark Mason for reasons laid out in this Memorandum.

                                **Background and Facts**

        That on December 19, 2013, petitioner, Mrs. Ruthie Tully, was a patron at the Dollar
Tree #1886, Bastrop, Louisiana. While shopping in the Dollar Tree #1886, Mrs. Ruthie Tully
decided to use the restroom before leaving the store. While in the restroom, Mrs. Tully slipped
and fell on the wet bathroom floor. Upon information and belief, the floor had just been mopped
and there were no wet floor signs present to warn petitioner at the time of her fall of this danger.
As a result of the slip and fall, Ruthie Tully sustained numerous injuries. Mr. John Tully rushed
to the restroom to help his injured wife, where he found her laying on the wet floor in severe
pain. Petitioner, Ruthie Tully, received injuries to her head, neck, wrist and right shoulder, which
required medical treatment due to the accident at defendant's facility.

                                **Law and Argument**

        Louisiana Revised Statue 9:2800.6, governs a negligence action against a merchant for
damages resulting from injuries sustained in a slip and fall accident. Under that statute, a
merchant owes a duty "to persons who use his premises to exercise reasonable care to keep his
… floors in a reasonable safe condition." The plaintiff's claim is governed by the merchant
statute, which requires that a plaintiff satisfy his burden of proof by establishing:

        (1)     The condition presented an unreasonable risk of harm to the claimant and that risk
                of harm was reasonably foreseeable;

(2)   The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence;

(3)   The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

Applying this standard, plaintiffs feel that summary judgment is not appropriate because there is a genuine dispute of material fact as to whether the condition, i.e. water on the floor in the bathroom presented an unreasonable risk of harm; there is a genuine dispute of material fact as to whether Dollar Tree had constructive notice of the condition, despite the policies in place Additionally, there was no sign or mark of any kind to warn customers that the floor may be wet. A merchant should anticipate that a liquid substance could be present in their store in an area where receptacles of water are present and take the appropriate precautions in these appropriate areas. Plaintiff, Ruthie Tully, entered the bathroom of the Dollar Tree where water receptacles were present. Plaintiff, Ruthie Tully, at a most vulnerable position, slipped and fell causing injuries to her head, neck, wrist and right shoulder requiring medical treatment for said injuries.

Defendants argue that that plaintiff was unable to establish that they had either created or had constructive notice of the water before plaintiff fell. In its Motion for Summary Judgment, defendants cite the affidavit of the store manager, Mark Mason, who had left the store some thirty minutes prior to the accident in question. Defendants further cited the affidavit of Colleen Laing, who was at work at the time of the accident and also came to check on Ms. Tully after her slip and fall in the bathroom. Ms. Laing stated that she had not mopped the bathroom on the date of the accident. Both Mr. Mason and Ms. Laing stated in their affidavit the procedure to be carried out for a spill.

Both plaintiffs, Ruthie and John Tully, stated that there was water on the floor. More particularly, Mr. Tully testified in his deposition on pages 14 and 15, that when he was assisting his wife up off the floor, the floor was wet around her feet and up close to her ankles, estimating a three (3) foot area. Mr. Tully further testified on page 15 that he used paper towels to mop up the water that was on the floor in order to avoid his wife falling yet again. There is no reason to dispute Mr. Tully's testimony. Could it not be reasonable to think that the water could have been from one of the receptacles in the bathroom and not just from someone mopping? Defendant is attributing the water to mopping. Could the puddle of water have come from the

laboratory or the toilet?

Although, Ms. Tully did not see the puddle prior to her fall, the testimony of Mr. Tully confirms that there was a liquid substance on the floor. Ms. Tully further testified in her deposition on page 37 line six & in ensuing succeeding testimony that after her fall she would not wish up her head to confirm this.

Following discovery, defendants have moved for summary judgment.  Plaintiffs show that there is a genuine issue of material fact and that defendants' motion should be denied.

**Conclusion**

For the reasons explained above, plaintiffs, request this Honorable Court to deny defendant's Summary Judgment on basis that genuine issues of material fact are present, making summary judgment inappropriate in this matter.

Respectfully submitted,

RICHARD L. FEWELL, JR. 18891
DUNCAN M. JONES, 34935
1315 CYPRESS ST.
WEST MONROE, LOUISIANA 71291
(318) 388-3320
*Attorney for plaintiffs,*
*Ruthie Tully and John Tully*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Opposition to Defendants' Motions for Summary Judgment and accompanying Memorandum has been mailed to the following counsel of record:

Matthew J. Ungarino
J. Michael Nash
910 Pierremont Road, Suite 103
Shreveport, Louisiana 71106

by depositing same in the U. S. Mail, postage prepaid, on this /7th day of June, 2015 at West Monroe, Ouachita Parish, Louisiana.

DUNCAN S. KEMP

JUN/23/2015/TUE 12:30 PM   Richard Fewell Jr.         FAX No. 310 300 3039          P. 007

STATE OF LOUISIANA * PARISH OF MOREHOUSE* FOURTH DISTRICT COURT

RUTHIE TULLY and JOHN TULLY

VERSUS NO. 2014-296

DOLLAR TREE STORES, INC. and
MARK MASON

                                        DEPUTY CLERK OF COURT

**AFFIDAVIT**

STATE OF LOUISIANA

PARISH OF OUACHITA

BEFORE ME, Notary Public, personally came and appeared RUTHIE TULLY, a
domiciliary of Morehouse Parish, Louisiana, who after being duly sworn, did depose and state:

Affiant declared that she is one of the plaintiffs in the above styled and captioned matter;

that on or about December 19, 2013, Affiant slipped and fell on the wet bathroom floor while a
patron at the Dollar Tree #1886 in Bastrop, Louisiana; that there were no signs present to warn
petitioner at the time of her fall of this danger; that Affiant suffered injuries to her head, neck
back and shoulder as a result of the slip and fall; that her husband, John Tully, found her laying
on the wet floor in severe pain; and that there exists genuine issues of fact to move forward with
this matter.

SWORN TO AND SUBSCRIBED before me, Notary Public, on this 17th day of June,
2015 at West Monroe, Ouachita Parish, Louisiana.

                                   Ruthie Tully
                                   RUTHIE TULLY

NOTARY PUBLIC

STATE OF LOUISIANA * PARISH OF MOREHOUSE* FOURTH DISTRICT COURT

RUTHIE TULLY and JOHN TULLY                    FILED._____

VERSUS NO. 2014-296

BOLLAR TREE STORES, INC. and                    _____
MARK MASON                                       DEPUTY CLERK OF COURT

                                                 AFFIDAVIT

STATE OF LOUISIANA
PARISH OF OUACHITA

BEFORE ME, Notary Public, personally came and appeared JOHN TULLY, a competent, at relevant and adult person, Louisiana, who after being duly sworn, did depose and state:

Affiant declared that he is one of the plaintiffs in the above styled and captioned matter; that on or about December 19, 2013, his wife, Ruthie Tully, slipped and fell on the wet bathroom floor while a patron at the Dollar Tree #1886 in Bastrop, Louisiana; that there were no signs present to warn petitioner at the time of his wife's fall of this danger; that his wife, Ruthie Tully, suffered injuries to her head, neck, back and shoulder as a result of the slip and fall; that Affiant found his wife, Ruthie Tully, laying on the wet floor in severe pain; and that there exists genuine issues of fact to move forward with this matter.

                                                 _____
                                                 JOHN TULLY

SWORN TO AND SUBSCRIBED before me, Notary Public, on this ___ day of June, 2015 at West Monroe, Ouachita Parish, Louisiana.

                                                 _____
                                                 NOTARY PUBLIC

4TH JUDICIAL DISTRICT COURT – PARISH OF MOOREHOUSE

STATE OF LOUISIANA

NUMBER: 2014-296                                                                                        SECTION "1"

RUTHIE TULLY and JOHN TULLY

VERSUS

DOLLAR TREE STORES, INC. AND MARK MASON

FILED: _____                          _____ DEPUTY CLERK

REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, come defendants, Dollar Tree Stores, Inc. and Mark Mason, who appear herein for the purpose of replying to the Opposition to Motion for Summary Judgment. This matter is set for hearing on June 25, 2015. Defendants maintain that there are no genuine issues of material fact, and that summary judgment is appropriate.

Knowledge of Defect

Defendants showed in their motion that they had no knowledge of water on the floor prior to the alleged accident involving Ms. Tully. They acknowledged that Ms. Tully had made statements reflecting that employees mentioned mopping that day. The affidavits of Mr. Mason and Ms. Laing confirm that there is no evidence of mopping that day. Plaintiffs do not dispute this. Instead, in their opposition, plaintiffs cite the fact that they saw water on the floor after the accident. What is missing from plaintiffs' testimony is any evidence that employees of Dollar Tree knew or should have known of something on the floor. To this end, they are silent. In contrast, the testimony of Ms. Laing shows that she was responsible for maintaining the restroom in question, that she checks the restroom throughout the day, and that she was not aware of any foreign substances on the floor prior to the alleged accident. Mr. Mason had testified, as to his lack of any knowledge of a foreign substance on the floor. Plaintiffs have not provided any evidence to establish actual or constructive notice on behalf of Dollar Tree.

In an effort to create a question of fact, plaintiffs note that the water might not have been from mopping (as they could not prove when any such mopping occurred), and instead suppose that the water could have come from the sink or commode. Of course, they provide no evidence any leaks. In fact, Ms. Tully confirmed that there were no leaks (R. Tully p. 52, lines 18-21), and thus Ms. Tully disproves her own theory. Regardless, plaintiffs claim that Dollar Tree had

1

1279]_20150623_ReplyOppMSJ_jinn

an obligation to discover this spill, even though they show no failure in the monitoring procedures used by Dollar Tree, as testified to by Mr. Mason and Ms. Laing. It appears that plaintiffs are arguing that the fact that water was present (according to their testimony), then there is a question of fact. As this court is well aware, existence of a hazard is but one of the several factors in proving merchant liability. Plaintiffs have completely failed to present any evidence on actual or constructive notice or on failure to exercise reasonable care. (Defendants do not stipulate the presence of any substance, but for purposes of argument show that plaintiffs lack evidence of other required burdens, and reserve the right to argue lack of hazard at trial).

The facts presented show no evidence of actual knowledge on behalf of defendants. The testimony of Mr. Mason and Ms. Laing show the existence of a policy regarding the maintenance of this restroom. With regard to constructive knowledge, the court in *Jones v. Brookshire Grocery Company*, 37,117 (La. App. 2 Cir. 5/14/2003), noted that constructive knowledge had to be proven by a time element. "Absent some showing of the temporal element, there can be no inference of constructive knowledge." The court further noted that the failure to prove any one element of their claim was "fatal".

<u>Failure of Mark Mason to Train Employees</u>

Plaintiffs had alleged that Mr. Mason failed to properly train his employees. As shown from the Motion for Summary Judgment, plaintiffs could not present any evidence of such a failure. Plaintiffs have not opposed this portion of the motion. Accordingly, Mark Mason should be dismissed as a defendant.

<u>CONCLUSION</u>

The Motion for Summary Judgment, along with the exhibits attached to the Memo in Support, which are adopted by the Motion, show that there are no questions of fact. While plaintiffs testify that water was on the floor after her accident, they do not provide any evidence that Dollar Tree had actual or constructive knowledge. The facts show that Dollar Tree had a policy to monitor the bathrooms, which they used, and that they were not aware of any foreign substances. Barring evidence of a temporal element, constructive knowledge cannot be inferred. Plaintiffs have abandoned their theory that the floor was recently mopped, as they admit in deposition that they had no evidence of this. Instead, they suppose (in direct contravention of plaintiff's sworn testimony) that maybe one of the fixtures had a leak. Because plaintiffs have failed to show actual or constructive knowledge, summary judgment, dismissing all claims, is appropriate.

Because there is no evidence that Mark Mason failed to properly train his employees, all claims against him should be dismissed.

Respectfully submitted,

UNGARINO & ECKERT LLC

MATTHEW J. UNGARINO (#15061)
J. MICHAEL NASH (#27021)
910 Pierremont Road, Suite 103
Shreveport, Louisiana 71106
Telephone:  318/866-9598
Fax:            318/866-9598
mnash@ungarino-eckert.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record, either by:

x   electronic delivery;
□   facsimile; or by
□   United States mail, properly addressed and first class postage prepaid on this ____ day of _____, 2015.

J. MICHAEL NASH

Received Time Aug. 20. 2014   3:17PM No. 3681

# RICHARD L. FEWELL, JR.

A PROFESSIONAL LAW CORPORATION

RICHARD L. FEWELL, JR.(APLC)
rfewell@centurytel.net

E. DION YOUNG, ASSOCIATE
edyleg@msn.com

PHONE: 318-388-3320

1315 Cypress Street
West Monroe, Louisiana 71291

MAILING ADDRESS
P. O. BOX 1437
WEST MONROE, LA 71291

DUNCAN M. JONES, ASSOCIATE
Jones.duncan.13@gmail.com

OSCAR P. BARNES, III, OF COUNSEL
opbarnes3@gmail.com

504-836-7566

FAX: 318-388-3337

August, 20, 2014

VIA CERTIFIED MAIL & FAX
Matthew Ungarino
Suite 1280 Lakeway Two
3850 North Causeway Blvd
Metairie, La 70002

RE:   Ruthie Tully, et al
      Versus No. 2014-296
      Dollar Tree Stores, Inc, et al

Dear Mr. Ungarino:

Enclosed please find Answers to Interrogatories and Requests for Admissions propounded to our client Ruthie Tully in reference to the above captioned matter. If you should have any questions, please feel free to call the office.

With kindest regards, I am

Very truly yours,

Arthur Edwards
Legal Assistant to
Duncan M. Jones

DMJ/ae
Enclosure: Answers to Interrogatories and Request


EXHIBIT
"B"

STATE OF LOUISIANA *** PARISH OF MOREHOUSE

FOURTH JUDICIAL DISTRICT COURT

RUTHIE TULLY and JOHN TULLY                    FILED:

VERSUS NO.: 2014-296

DOLLAR TREE STORES, INC.
AND MARK MASON

                                               DEPUTY CLERK

## ANSWERS TO INTERROGATORIES AND REQUEST FOR ADMISSIONS PROPOUNDED TO RUTHIE TULLY

TO:     Matthew Ungarino
        Suite 1280 Lakeway Two
        3850 North Causeway Boulevard
        Metairie, Louisiana 70002

        NOW INTO COURT, through undersigned counsel, comes Petitioner, RUTHIE TULLY, who responds to the Interrogatories and Request for Admissions propounded to them, as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1:**

        Do plaintiff's damages exceed $75,000.00?

**ANSWER TO INTERROGATORY NO. 1:**

        Medical treatment for Plaintiff has not been completed at this time. This information is not discoverable at this time and this Interrogatory will be supplemented at or before the time of the trial.

**INTERROGATORY NO. 2:**

        Do plaintiff's damages exceed $50,000.00?

**ANSWER TO INTERROGATORY NO. 2:**

        Medical treatment for Plaintiff has not been completed at this time, but Plaintiff does expect damages to exceed $50,000.00.

## REQUEST FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

        Plaintiff's damages do not exceed the sum of $75,000.00.

**ANSWER TO REQUEST FOR ADMISSION NO. 1:**

        Deny

## REQUEST FOR ADMISSION NO. 2:

Plaintiff's damages do not exceed the sum of $50,000.00.

## ANSWER TO REQUEST FOR ADMISSION NO. 2:

Deny

Respectfully submitted,

DUNCAN & JONES
La. Bar No. 34955
RICHARD L. FEWELL, JR.
La. Bar No. 18891

1315 Cypress Street
P.O. Box 1437
West Monroe, LA 71294
Telephone: (318) 388-3320
Fax: 318-388-3337

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record, by placing a copy of same in the United States mail, postage prepaid, on this 20th day of _____, 2014 at Monroe, Louisiana.

DUNCAN & JONES

Patient:          -430981 - Ruthie A. Tully
DOB:               03/27/1950
SSN:               *******3011

Date:              02/24/2014 13:30
Provider:          DeGravelle, Martin Jr
Encounter:         Follow-Up

## REASON FOR VISIT
MRI results Right shoulder and Cervical MRI results.

## ACTIVE PROBLEMS
• Cervicalgia
• Joint Pain-Shlder - Right
• Rotator Cuff Rupture

## HISTORY OF PRESENT ILLNESS
Ruthie Tully is a 63 year old female.
•Medication list reviewed.

Ruthie Tully is here today for the MRI results of her shoulder and her cervical spine.

The MRI of the shoulder showed AC joint arthritis with subacromial bursitis with the degree of tendinopathy of the supraspinatus and infraspinatus with a PASTA-type tear and also with near rupture of her biceps tendon and some posterior deltoid infiltration and atrophy which could be consistent with a traction injury.

The cervical spine MRI showed some moderate spondylosis at C6 and C7 with some foraminal stenosis on the left at C7.

## CURRENT MEDICATION
• Biotin 5000 MCG TABS,  , 0 days, 0 refills
• Estropipate 1.5 MG TABS, , 0 days, 0 refills
• Gabapentin 300 MG CAPS, , 0 days, 0 refills
• Lisinopril – HCTZ 20-12.5 mg  TABS, , 0 days, 0 refills
• Omeprazole 20 MG CPDR, , 0 days, 0 refills
• Simvastatin 20 MG TABS, , 0 days, 0 refills
• Zoloft 100 MG TABS, , 0 days, 0 refills

## PAST MEDICAL/SURGICAL HISTORY
Reported:
Surgical /Procedural: Prior surgery: Tonsillectomy/Adenoidectomy,
1966 Wisdom Teeth.
Diagnoses:
Hypertension.
Esophageal reflux.
Surgical:


EXHIBIT
tabbies®

Patient:        430981 - Ruthie A. Tully
DOB:            03/27/1950
SSN:            *******3011

Date:           02/24/2014 13:30
Provider:       DeGravelle, Martin Jr
Encounter:      Follow-Up

• Thyroid surgery 2004
• Gallbladder surgery
• Hernia repair 2003
• Hysterectomy 1997

SOCIAL HISTORY
Behavioral: No tobacco use and smoking status: Never smoked.
Alcohol: Not using alcohol.
Drug Use: Not using drugs.
Work: Working as a homemaker.
Marital: Currently married.

ALLERGIES
• No Known Allergies

PHYSICAL FINDINGS
• Vitals taken 02/24/2014 01:34 pm
  Verbal height and weight. Pt did not take her BP meds yet today.
  BP-Sitting L                           166/87 mmHg
  Pulse Rate-Sitting                     92 bpm
  Height                                 64 in
  Weight                                 218 lbs
  Body Mass Index                        37.4 kg/m2
  Body Surface Area                      2.03 m2

GENERAL: Well developed, well nourished female in no apparent distress. Ambulates into
clinic without assistive devices.   HEENT: NCAT. Mucous membranes moist.
NEUROLOGIC: Awake, alert and oriented x 3. Normal affect.  CARDIOVASCULAR:
regular rate and rhythm.  No clubbing, cyanosis or edema.
RESPIRATORY: No cough, audible wheeze, or labored breathing.  ABDOMEN: Soft,
non-tender, non-distended.  INTEGUMENT: No lesions, rashes, or wounds.
MUSCULOSKELETAL:  Regarding her right shoulder, she has pain and weakness with
rotator cuff testing and positive tenderness to palpation over the biceps tendon and AC joint.
She has a positive Speed's test of the biceps and positive impingement, 1 and 2.

Plan:
At this point, I think she would benefit from surgical treatment of this consisting of a right
shoulder arthroscopy with a subacromial bursectomy and acromioplasty with distal clavicle
excision of her biceps tenotomy.  I would also evaluate her rotator cuff and if it is near
completely torn then completing the tear and repairing it would also benefit her.  I went over
the risks and benefits.  We will get this set up for her.

Patient:     430981—Ruthie A. Tully
DOB:         03/27/1950
SSN:         *******3011

Date:        02/24/2014 13:30
Provider:    DeGravelle, Martin Jr
Encounter:   Follow-Up

THERAPY
• Clinical summary provided to patient.

PLAN

• Rotator Cuff Rupture
  Surgery/Upper Extremity: Right shoulder scope Rotator cuff repair--298272

HEALTH REMINDERS
• Assess Tobacco Use satisfied 02/24/2014.

Martin DeGravelle Jr
Electronically signed by: Martin deGravelle     Date: 02/25/2014 13:58

Electronically approved by: Martin deGravelle    Date: 02/25/14 13:58

NORTH LOUISIANA
ORTHOPAEDIC AND SPORTS MEDICINE CLINIC
1501 Louisville Avenue, Monroe, Louisiana 71201
Phone: (318) 323-8451    Fax: (318) 361-2613

## MRI REPORT

DATE: 02/06/2014   PATIENT NAME: Ruthie A Tully (430981)

REFERRING PHYSICIAN: Martin deGravelle, Jr., M.D.

ALL REPORTS THAT ARE NOT SIGNED ARE PRELIMINARY:

EXAM: MRI OF THE RIGHT SHOULDER

PROCEDURE: Coronal T1, fast spin multi-echo, gradient echo and STIR, axial T1 and gradient echo and off axis sagittal T1 and fast spin T2 weighted sequences of the right shoulder. Axial STIR sequence through the proximal humerus.

FINDINGS: There is moderate hypertrophy of the acromioclavicular joint. Mildly downsloping acromion. Small-moderate amount of fluid within the subacromial bursa. Severe tendinopathy of the supraspinatus tendon extending to the humeral insertion anteriorly. There is significant thinning of the articular margin still with an intact bursal margin. There is some retraction of the inferior fibers. No muscle atrophy. The infraspinatus is similar but less involved. Teres minor intact. Subscapularis intact. There is fatty infiltration and atrophy of the deltoid muscle greater posteriorly. The biceps tendon is intact within the bicipital groove but is very difficult to follow-up across the rotator interval and is either torn or severely attenuated. The superior labrum is somewhat degenerated but there is no acute tear. The posterior, inferior and lower anterior labrum are grossly intact. No osteochondral lesion.

IMPRESSION:
1. Moderate acromioclavicular joint hypertrophy. Moderate subacromial bursitis. Severe tendinopathy of the supraspinatus and infraspinatus insertions with irregular thinning of the articular margin and some PASTA component. The bursal margin appears to be intact for both. There is no muscle atrophy. The remainder of the rotator cuff is intact.
2. Severe tendinopathy of the biceps tendon at the level of the rotator interval with either rupture or Near-rupture. Functional integrity must be determined clinically.
3. There is mild fatty infiltration and atrophy of the deltoid particularly posteriorly. There is no denervation of the teres minor muscle to suggest axillary nerve dysfunction and etiology is otherwise not obvious.

J. Michael Barraza, M.D.
Electronically signed by: J. Michael Barraza, M.D.

NORTH LOUISIANA
ORTHOPAEDIC AND SPORTS MEDICINE CLINIC
1501 Louisville Avenue, Monroe, Louisiana 71201
Phone: (318) 323-8451   Fax: (318) 361-2613

## MRI REPORT

DATE:  02/06/2014 PATIENT NAME: Ruthie A Tully (430981)

REFERRING PHYSICIAN: Martin deGravelle, Jr., M.D.

ALL REPORTS THAT ARE NOT SIGNED ARE PRELIMINARY:

EXAM: CERVICAL MRI.

TECHNIQUE: Sagittal T1 proton density T2 weighted and angled axial gradient echo sequences through the cervical spine.

FINDINGS: Cervical alignment and curvature are normal. There is moderate spondylosis of the C6-7 disc space with moderate uncinate process hypertrophy. There is moderate apophyseal joint hypertrophy throughout the cervical region generally greater on the right. Hard annular bulging or protrusion at C6-7. There is cord impingement with marginal-mild central stenosis. No cord distortion. There is moderate C7 foraminal stenosis greater on the left. There is a small central protrusion at C7-T1. No central or foraminal stenosis. Minor degenerative changes at C5-6. No fracture or underlying bony pathologic process. No intrinsic cord, extramedullary, or epidural process. Craniocervical junction within normal limits. Upper thoracic region within normal limits through T5.

IMPRESSION:
1.    Moderate spondylosis of the C6-7 disc space.  Moderate apophyseal joint hypertrophy diffusely.  Mild central and moderate C7 foraminal stenosis greater on the left.  Small protrusion, but no significant stenosis at C7-T1.


J. Michael Barraza, M.D.
Electronically signed by:  J. Michael Barraza, M.D.

# RICHARD L. FEWELL, JR.

A PROFESSIONAL LAW CORPORATION

RICHARD L. FEWELL, JR.(APLC)
rlfewell@centurytel.net

E. DION YOUNG, ASSOCIATE
edylaw@msn.com

DUNCAN M. JONES, ASSOCIATE
jones.duncan.13@gmail.com

OSCAR P. BARNES, III, OF COUNSEL
opbarnes52@gmail.com

1315 Cypress Street
West Monroe, Louisiana 71291

MAILING ADDRESS
P. O. BOX 1437
WEST MONROE, LA 71294

PHONE: 318-388-3320

FAX: 318-388-3337

July 6, 2015

VIA FAX and EMAIL

Mr. Michael Nash
910 Pierremont Road, Suite 10
Shreveport, LA 71106

RE:    Ruthie Tully, et al
       Versus No. 2014-296
       Dollar Tree Stores, Inc, et al

Dear Mr. Nash,

As per our conversation today and after reviewing the report and surgery recommendation by her treating orthopedic physician, it is my belief that the claims involving Ruthie and John Tully exceed $75,000.00.

With kind regards, I remain

Very truly yours,



Duncan M. Jones



EXHIBIT